PRESENT: Hassell, C.J., Lacy, Keenan, Koontz, Kinser, and Lemons, JJ., and Carrico, S.J.[1]

KEVIN GREEN

v. Record No. 020757   OPINION BY JUSTICE CYNTHIA D. KINSER
                                        June 6, 2003
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF BRUNSWICK COUNTY
James A. Luke, Judge


This capital murder case is before the Court for the second time.  We previously reversed Kevin Green's conviction for the 1998 capital murder of Patricia L. Vaughan and remanded the case to the circuit court for a new trial.  Green v. Commonwealth, 262 Va. 105, 118, 546 S.E.2d 446, 452 (2001).[2]  Upon retrial, a jury again convicted Green of capital murder during the commission of robbery in violation of Code § 18.2-31(4).  At the conclusion of the penalty phase of the bifurcated trial, the jury fixed Green's punishment at death, finding "that there is a probability that [Green] would commit criminal acts of violence that would constitute a continuing serious

---

[1] Chief Justice Carrico presided and participated in the hearing and decision of this case prior to the effective date of his retirement on January 31, 2003.

[2] Green's convictions for robbery, the malicious wounding of Lawrence T. Vaughan, and three counts of the illegal use of a firearm were not before the Court in the prior appeal, Green, 262 Va. at 108, 546 S.E.2d at 447, nor are they at issue in the present appeal.

threat to society" (the "future dangerousness" predicate), and "that his conduct in committing the offense [was] outrageously or wantonly vile, horrible or inhuman in that it involved . . . both aggravated battery to the victim and depravity of mind" (the "vileness" predicate).  See Code §§ 19.2-264.2 and -264.4(D).  The circuit court subsequently sentenced Green in accordance with the jury verdict.

We consolidated the automatic review of Green's death sentence with the appeal of his capital murder conviction.  See Code § 17.1-313(F).  Upon considering the issues raised by Green and conducting our mandated review of the imposition of the death penalty, we find no error in the judgment of the circuit court.  Thus, we will affirm that judgment and the sentence of death in this case.

## I. FACTS

### A. GUILT PHASE

The victim, Patricia L. Vaughan, and her husband, Lawrence T. Vaughan, owned and operated a small grocery store in Brunswick County.  As part of their grocery store operation, the Vaughans regularly cashed checks for employees of several nearby businesses, including a lumber company that paid its employees on Friday of each week.  Consequently, Mr. Vaughan routinely went to a bank on

2

Fridays to obtain sufficient currency to cash payroll checks for the lumber company employees. And, he did so on Friday, August 21, 1998. Upon returning from the bank on that Friday, he placed $10,000 in a bank bag that he kept in a cabinet underneath the cash register, another $10,000 elsewhere in the store, and the remaining cash in a safe.

On the day in question, as Mr. Vaughan was starting to eat lunch and to file an invoice, two men entered the store. Mr. Vaughan saw them and recognized the taller of the two men as Kevin Green, the defendant. Green had worked for the lumber company for approximately eight to ten weeks during the preceding spring, and had frequented the Vaughans' grocery store at lunchtime, after work, and on Fridays to cash his payroll checks.

When the two men entered the store, Mrs. Vaughan had her back to the door and was standing five or six feet from Mr. Vaughan. Thinking that the shorter man was going over to the "drink box," Mr. Vaughan turned around to finish his filing. As he did so, he heard his wife scream, "Oh, God." At trial, Mr. Vaughan described what he then heard:

> It was four bangs. Bang, bang and I was hit. I didn't know where I was hit, but I was hurt. I turned a complete turn and fell on the floor, sit [sic] down on my right foot and broke my right ankle. And about [the] time I went down, I looked up and I realized it was a gun being fired. I could see him, he shot toward my

wife with the fourth shot.  I saw his hand with a pistol in it.  He was holding [it] like he was target practicing.

Mr. Vaughan testified that Green, after firing the four shots, walked back to the door and stood there "as a lookout" while the other man came around behind the counter and tried to open the cash register.  When the drawer on the cash register jammed, Green directed the shorter man to look under the counter.  Upon doing so, he found the bank bag containing approximately $9,000 in cash and Mr. Vaughan's pistol, which he then used to shoot through the key hole in the cash register drawer.  Taking the bank bag and the pistol, the shorter man exited the store, but Green walked a few steps over to where Mrs. Vaughan was lying on the floor and pointed the gun at her again.  According to Mr. Vaughan, the gun misfired, and Green ejected a live cartridge onto the floor.  Green then fired two more shots in the direction of Mrs. Vaughan.  Lowering his head, Mr. Vaughan heard the gun "snap" one more time, but he did not know whether Green was pointing the gun at him or his wife. Only then, when the gun was empty, did Green leave the store.

After Green left, Mr. Vaughan dragged himself approximately five feet across the floor of the store to a telephone and dialed the "911" emergency number, but he was

4

too weak to reach his wife who was still lying on the floor.  One of the first police officers to arrive at the scene testified that he observed "puddles of blood just pouring out of [Mrs. Vaughan's] nose, her mouth, [and] her head."  A local volunteer medical examiner determined that Mrs. Vaughan had died at the scene of the shooting.

A subsequent autopsy of Mrs. Vaughan's body revealed that she sustained four gunshot wounds.  One bullet penetrated the left side of her head, passed through the temporal and frontal lobes of her brain, and lodged in the inner frontal sinus of her face.  Another bullet entered the right side of her chest and went into the upper lobe of her right lung.  A third bullet penetrated the left side of her back.  This was the only non-lethal wound.  The fourth bullet entered the right side of Mrs. Vaughan's back and penetrated two lobes of her right lung.  According to the forensic pathologist who performed the autopsy, Dr. Jose Abrenio, this wound caused hemorrhaging in her thoracic cavity, which led to difficulty in breathing and had the effect of suffocating her.  Dr. Abrenio also opined that Mrs. Vaughan survived "seconds to minutes" after she was first shot.

Four days after the murder, a warrant was issued to search Green, his residence, and automobile.  During the

5

search of his home, six bullets were retrieved from the trunk of a tree in his yard.  The bullets were found behind a "makeshift target" hanging on the tree.  Forensic testing on those six bullets and the four bullets recovered from Mrs. Vaughan's body during the autopsy revealed that all ten "caliber 25 Auto full metal jacketed bullets" had been fired from one weapon.  About 35 to 50 feet from the tree, 16 25-caliber empty cartridge casings were also recovered.

After Green was arrested, he executed a form waiving his Miranda rights and agreed to be questioned by law enforcement officers.  During that interrogation, Green admitted that he and his cousin, David Green, robbed the Vaughans' grocery store and that he selected their store because he knew the Vaughans kept a lot of money there. Green and his cousin had originally planned to wear masks to conceal their faces.  However, they discarded the masks after they had to wait behind the store in their automobile for about an hour because other people were in the grocery store.  Green also admitted that he shot both of the Vaughans, hitting Mrs. Vaughan four times.

### B. PENALTY PHASE

During the penalty phase of the trial, the Commonwealth presented testimony from several correctional officers who had supervised Green's incarceration at

6

different times and facilities.  Much of their testimony described incidents during which Green exhibited disruptive behavior, refused to obey instructions, and made threats to the officers.  For example, one officer testified that Green "clinched" the bars of his cell and said, "I'll get you, I will get you."  Another officer stated that, when Green had to be placed in isolation because of his disruptive conduct, Green started throwing anything he could find, flushing the toilet, and throwing water into the hallway.  Green then told the officer that he was going to make the officer's life "a living hell."  Other personnel described incidents in which Green threw food, trash, and feces on the floor and refused to take his medication.

In addition to this testimony, the Commonwealth called Clement Leon Cleaton, an acquaintance of Green.  Cleaton testified that Green had threatened to rob and kill him and that he had heard Green threaten to rob a man selling ice cream from a truck.  Cleaton also related an incident in which Green had shot several times toward Cleaton's "hog pen" while Cleaton was feeding his hogs.  Cleaton had asked Green not to shoot in that direction.

As evidence of mitigating circumstances, Green introduced testimony from Dr. Jack Daniel, an expert in the

field of forensic pathology.  Dr. Daniel had reviewed Mrs. Vaughan's death certificate, the medical examiner's report, and Dr. Abrenio's autopsy report.  He testified that he found no evidence in those documents that Mrs. Vaughan had endured prolonged suffering before she died from the gunshot wounds.  However, Dr. Daniel agreed that it was not possible to determine whether the blood found in Mrs. Vaughan's chest cavity during the autopsy was the result of an immediate bleeding at the time of the injury or accumulated during the hours following her death.

The jury also heard evidence from Dr. Scott W. Sautter, an expert in neuropsychology who had tested Green's I.Q. on two separate occasions using two different tests, the "Wechsler abbreviated intelligence scale" and the "Wechsler [A]dult [I]ntelligence [S]cale [R]evised." Dr. Sautter testified that, while the formats of the two tests are similar, the "two tests are not exactly the same."  Dr. Sautter reported that Green had a full-scale I.Q. score of 74 on the Wechsler Adult Intelligence Scale and a score of 55 on the "abbreviated" test.  With that level of intellectual functioning, Dr. Sautter stated that Green could work best in a structured environment with guidance and supervision, and that he would expect Green to have difficulties in independent living, managing a budget,

8

and going to a job on a consistent basis.  Based upon his evaluation of Green in a prison setting, Dr. Sautter also opined that, in a maximum-security situation, Green would not be a danger to others and his behavior would be appropriate.  However, in a less secure environment, Dr. Sautter opined that Green would be susceptible to harm from other people because of his limited capacity for communication.

Two clinical psychologists testified for the Commonwealth in rebuttal to Dr. Sautter's testimony.  Dr. Lynda J. Hyatt reported that Green had an I.Q. score of 84 on the "Ammons & Ammons quick test," which placed Green in the category of "low average" mental functioning.  Dr. Thomas A. Pasquale evaluated Green's personality as well as his intellectual functioning.  Dr. Pasquale diagnosed depression, alcohol dependency, drug abuse, anti-social personality disorder, and malingering.  According to Dr. Pasquale, Green had a full-scale I.Q. score of 74 on the Weschler Adult Intelligence Scale, placing him in the "borderline range" of intellectual functioning.  With regard to Green's adaptive functioning, Dr. Pasquale noted that Green had worked at a pizza restaurant where he functioned routinely in taking orders, delivering pizzas, and using the cash register; and that Green paid his own

rent, lived with a friend, and had a driver's license.  Dr.
Pasquale also opined that Green is a high risk for violence
in an "open community" but that, in a prison setting, the
probability of such risk is low.[3]

## II. ANALYSIS

## A. PRE-TRIAL ISSUES

### 1. APPOINTMENT OF EXPERTS

Green assigns error to the circuit court's refusal to
appoint an investigator, a mitigation specialist, and a
jury expert to assist him in his defense.  Although Green
moved the court to appoint an investigator, he never asked
for a mitigation specialist or a jury expert.  Thus, he is
now barred from raising any claim on appeal regarding the
court's failure to appoint those two experts.  See Rule
5:25.

As to his request for an investigator, Green asserted
in his motion before the circuit court that he needed this
type of expert assistance because he had no available
investigative resources, and because his counsel lacked
both formal training in criminal investigation and the time
to interview essential witnesses.  Green claimed that an
investigator would have "the expertise necessary to locate

---

[3] We will present additional facts and proceedings as
necessary to address specific issues.

10

essential witnesses and data, examine and evaluate testimony and documents using his or her special knowledge of the issues likely to be significant at a capital murder trial, issues beyond the comprehension of the ordinary layman."  On appeal, he asserts that the "imbalance" resulting from his lack of investigative resources as compared to the Commonwealth's vast resources violated his equal protection and due process rights as well as his Sixth Amendment right to counsel.

As this Court has previously stated, a defendant does not have an absolute right to the assistance of an investigator, even when charged with capital murder. Bailey v. Commonwealth, 259 Va. 723, 737, 529 S.E.2d 570, 578 (2000).  Instead, as with any request for the appointment of an expert, a defendant "must show a particularized need" by establishing "that the services of an expert would materially assist him in the preparation of his defense and that the denial of such services would result in a fundamentally unfair trial."  Husske v. Commonwealth, 252 Va. 203, 212-13, 476 S.E.2d 920, 925-26 (1996).  The determination whether a defendant has made an adequate showing of particularized need for expert assistance lies within the sound discretion of the trial court.  Id.; see also Lenz v. Commonwealth, 261 Va. 451,

11

462, 544 S.E.2d 299, 305, cert. denied, 534 U.S. 1003 (2001); Bailey, 259 Va. at 737, 529 S.E.2d at 578.

The reasons Green presented to the circuit court to justify his request for the appointment of an investigator are strikingly similar to those offered by the defendant in Bailey, 259 Va. at 737-38, 529 S.E.2d at 578.  Bailey, like Green, claimed he needed an investigator to "locate essential witnesses and data, [and] examine and evaluate testimony and documents . . . likely to be significant at a capital murder trial."  Id.  We concluded that Bailey's assertions fell "far short of demonstrating a particularized need for the services of an expert."  Id.

We reach the same conclusion in the present case.  A particularized need is more than a "[m]ere hope" that favorable evidence can be obtained through the services of an expert.  Husske, 252 Va. at 212, 476 S.E.2d at 925-26.  Thus, we hold that the circuit court did not abuse its discretion in denying Green's motion for the appointment of an investigator.[4]

### 2. VILENESS AGGRAVATING FACTOR

---

[4] To the extent that Green also argues that the Sixth Amendment requires the appointment of an investigator, we rejected that argument in Lenz, 261 Va. at 462, 544 S.E.2d at 305.

Green filed a pre-trial motion asking the circuit court to rule that the evidence available to the Commonwealth would be insufficient, as a matter of law, to establish the "vileness" aggravating factor. Green now claims that the court erred in denying that motion.

There is no procedure in Virginia that allows a circuit court, in a pre-trial context, to rule on the sufficiency of the Commonwealth's evidence in a criminal case. Instead, the court must determine the sufficiency of that evidence based on the record made at trial. Furthermore, as explained in Section (D)(2) below, there is sufficient evidence in this case to support the jury's finding of the "vileness" predicate. Thus, the circuit court did not err in denying this pre-trial motion.

### 3. DISCOVERY

Green assigns error to the circuit court's order limiting discovery to the materials and information allowed by Rule 3A:11. However, Green does not identify any specific evidence or information that he sought in discovery but which the Commonwealth refused to disclose. Thus, we find no merit in his argument that he was entitled to expanded discovery rights. Additionally, the record reflects that he received all the discovery to which he was

entitled under Rule 3A:11. See Bailey, 259 Va. at 736, 529 S.E.2d at 577.

### B. JURY SELECTION ISSUES

### 1. CHANGE OF VENUE

Prior to trial, Green moved for a change of venue or, in the alternative, for a venire from another county or city not bordering Brunswick County. In support of his motion, Green submitted copies of 37 newspaper articles concerning this case, affidavits from six people, and the results of an informal survey conducted by Green's counsel. Although Green initially stated that he would like to have the issue resolved quickly, the circuit court, after hearing argument, took the motion under advisement. Green did not object to the court's decision to do so.

At the conclusion of the penalty phase of the trial, the court remarked from the bench that the defense had moved for a change of venue "way back" and that "[i]t was taken under advisement." In order for the record to reflect a ruling on the motion, the court then stated that it considered the motion denied at the time the jury was empanelled. The court memorialized its decision in an order entered nunc pro tunc October 29, 2001.

Green now assigns error to the court's ruling. However, the Commonwealth asserts that Green is barred

under Rule 5:25 from arguing that the circuit court should have granted a change of venue or that the voir dire process was "unreliable and not above suspicion."  The Commonwealth premises its argument on the fact that Green failed to renew his motion for a change of venue either after voir dire was completed or before the jury was empanelled and sworn.

The record reflects that, after 24 jurors had been qualified and immediately before the parties made their peremptory strikes, the court asked if there were "[a]ny preliminary matters before we bring the jury in?"  Green's counsel stated, "No, sir."  When those 24 jurors returned to the courtroom, the court directed the parties to begin exercising their strikes.  At that point, Green's counsel stated, "Defense is ready."  When the parties completed their peremptory strikes, the court asked, "[I]s that your jury?"  Defense counsel answered, "Yes, sir."  At no time did Green's counsel ask the court to rule on the motion for a change of venue previously taken under advisement or renew that motion.

Nevertheless, Green disputes any waiver of this issue. He argues that the court obviously knew that the motion for a change of venue was still pending since the court announced its ruling on the motion at the end of the trial.

15

Green also asserts that he reminded the court of the outstanding motion when, just prior to commencement of voir dire, he introduced into evidence the newspaper articles and affidavits that he had previously attached to his memorandum in support of the motion.

We do not agree with Green's position. The posture of the change of venue motion in this case is analogous to the situation presented in Hoke v. Commonwealth, 237 Va. 303, 377 S.E.2d 595 (1989). There, the defendant moved for a change of venue but requested that the motion be continued in order to determine whether a jury could be empanelled. Id. at 306, 377 S.E.2d at 597. The defendant agreed that he could renew the motion if, as a result of jury voir dire, there was a problem. Id. Because the defendant never renewed the motion, we refused to consider his contention on appeal that the trial court had abused its discretion by failing to grant a change of venue. Id.

Although Green did not agree to continue his change of venue motion as did the defendant in Hoke, Green, however, did not object to the circuit court's decision to take the motion under advisement pending the outcome of voir dire. Consequently, it was incumbent upon Green to renew the motion before the jury was empanelled and sworn, or at least remind the court that it was still pending and that

16

he wanted the court to rule on it.  Cf. Lenz, 261 Va. at 462-63, 544 S.E.2d at 305-06 (pretrial motion waived when defendant failed to request a ruling from the trial court). Indeed, that was precisely the procedure followed by the defendant in Thomas v. Commonwealth, 263 Va. 216, 559 S.E.2d 652 (2002), a case in which this Court reversed a trial court's refusal to grant a change of venue.  Thomas filed a pre-trial motion for a change of venue, which the trial court took under advisement, but Thomas, unlike Green, renewed the motion following voir dire.  Id. at 230, 559 S.E.2d at 659.

Not only did Green fail to renew his motion for a change of venue once the court took it under advisement, he also implicitly consented to the seating of the jury in this case.  Cf. Commonwealth v. Washington, 263 Va. 298, 304, 559 S.E.2d 636, 639 (2002) (holding defendant implicitly consented to trial court's declaration of a mistrial); but cf. King v. Commonwealth, 264 Va. 576, 577-78, 570 S.E.2d 863, 863-64 (2002) (holding defendant did not expressly or implicitly waive objection raised in motion to strike the evidence when defendant later did not object to a jury instruction covering the same issue). After voir dire was completed but before the parties exercised their peremptory strikes, the court specifically

17

asked whether the parties had any matters to bring before the court. Similarly, when the parties completed their peremptory strikes, the court asked, "[I]s that your jury?" Instead of reminding the court about his pending change of venue motion at that point, Green's responses to the court's questions actually indicated that he had no remaining issues to raise with regard to jury selection or any objections to empanelling that jury. In short, he gave the circuit court no reason to believe that he was still pursuing a change of venue. Cf. Breard v. Commonwealth, 248 Va. 68, 80, 445 S.E.2d 670, 677 (1994) (trial court reasonably could have assumed defendant acquiesced in seating a juror when defendant failed to renew motion to strike the juror after the court said it would rehear the motion upon completion of voir dire). Green's responses were tantamount to a waiver of his prior motion. Thus, we will not address Green's claim that the circuit court erred by refusing to grant his motion for a change of venue.[5] See Rule 5:25.

## 2. JUROR QUESTIONNAIRE

---

[5] Green also asserts on brief that the voir dire process was unreliable and that the prospective jurors' responses during voir dire were not forthcoming and credible. Green presents this argument for the first time on appeal. Thus, we will not consider it. Rule 5:25.

18

Green claims that the circuit court erred by denying his request to submit a questionnaire to prospective jurors. At a pre-trial hearing, Green advised the court that he intended to file a written motion on this matter along with a sample questionnaire. Our review of the record discloses that Green never filed either the motion or the sample questionnaire. Nor does the record contain any argument, oral or written, in support of such a motion. Instead, we find only the court's order denying a motion for a jury questionnaire. Thus, Green is now barred from presenting argument for the first time on appeal with regard to this issue. Rule 5:25.

Moreover, we have previously held that the use of a juror questionnaire outside the courtroom would undermine the value derived from a trial court's opportunity to observe and evaluate prospective jurors first hand. Strickler v. Commonwealth, 241 Va. 482, 492-93, 404 S.E.2d 227, 234 (1991). Accordingly, we find no abuse of discretion by the circuit court on this issue.

### 3. VOIR DIRE QUESTIONS

Green submitted a list of 79 proposed voir dire questions, which he later shortened to 52 questions. On appeal, he claims that the circuit court erred by

specifically disallowing seven of those questions.  Those

seven questions as enumerated on the longer list are:

> No. 59. You understand there are twelve people on the jury.  Why do you think there are twelve people on the jury?

> No. 60. If there is a unanimous verdict, what does this mean about your discussion about the case?

> No. 61. What do you think about the death penalty?

> No. 67. What is the first thing that comes into your mind when you look at the defendant? What else do you see in him?

> No. 68. What kinds of adjectives or descriptive words would you use to describe this defendant to a spouse or friend?

> No. 69. What are your assumptions or opinions about him just because he is sitting here on trial?

> No. 71. How do you feel about life in prison without parole as punishment?

These seven questions were "an invitation to a

rambling discourse on a broad range of emotions."  Buchanan

v. Commonwealth, 238 Va. 389, 402, 384 S.E.2d 757, 765

(1989).  A defendant does not have a right to propound any

question he wishes, Bell v. Commonwealth, 264 Va. 172, 196,

563 S.E.2d 695, 711 (2002), and "trial courts are not

required to allow counsel to ask questions which are so

ambiguous as to render the answer meaningless," Buchanan,

238 Va. at 401, 384 S.E.2d at 764.  Instead, voir dire

20

questions must relate to the four statutory factors of relationship, interest, opinion, or prejudice. See Code § 8.01-358 ("counsel for either party shall have the right to examine under oath any person who is called as a juror . . . to ascertain whether he is related to either party, or has any interest in the cause, or has expressed or formed any opinion, or is sensible of any bias or prejudice therein").

We conclude that the circuit court provided Green with "a full and fair opportunity," LeVasseur v. Commonwealth, 225 Va. 564, 581, 304 S.E.2d 644, 653 (1983), to determine whether each prospective juror could "stand indifferent in the cause," Code § 8.01-358. When, as here, a

> trial court affords ample opportunity to counsel to ask relevant questions and where the questions actually propounded by the trial court were sufficient to preserve a defendant's right to trial by a fair and impartial jury, we will generally not reverse a trial court's decision to limit or disallow certain questions from defense counsel.

Buchanan, 238 Va. at 401, 384 S.E.2d at 764. Furthermore, the circuit court stated that its voir dire of prospective jurors would cover the issues concerning the death penalty and life in prison without parole addressed in question Nos. 61 and 71 and that, depending on a juror's responses, the court would allow follow-up questions by counsel.

21

Thus, the court did not abuse its discretion in refusing to allow Green to ask these seven questions.

Green also complains that the bifurcated procedure for felony trials prevented him from asking prospective jurors at the guilt phase about evidence of other crimes that the Commonwealth intended to use at the penalty phase to prove future dangerousness. However, Green does not assert that he attempted to ask any specific questions about other crimes. Nor did he argue to the circuit court that the bifurcated procedure prejudiced his ability to conduct voir dire of potential jurors. Thus, we will not consider this issue on appeal. Rule 5:25. We note, however, that the court allowed Green to ask prospective jurors whether they could consider his lack of a violent criminal record prior to this incident as a reason for not imposing the death penalty.

Green's last assignment of error regarding voir dire deals with the following questions proposed by the Commonwealth:

> No. 16. What contact did you have with the police in connection with that incident? Were you satisfied with the work of the police in connection with that incident[?] Were you satisfied with the work of the Courts[?]

> No. 23. Have you, or a family member, friend, or acquaintance ever been prosecuted for

22

a criminal offense?  Do you feel that person was treated fairly by our system of justice?

We cannot find, nor does Green identify, any instance where the Commonwealth asked question No. 16.  Thus, the issue whether the circuit court abused its discretion by allowing that question is moot.  We also find no abuse of discretion by the court in allowing the Commonwealth to pose question No. 23 to prospective jurors.  That question was designed to discover a potential juror's possible prejudice against the Commonwealth, which is a proper subject for inquiry under Code § 8.01-358.

### 4. JUROR WILLIAMS

Green contends that the circuit court erred by excusing prospective juror Williams for cause.  The court granted the Commonwealth's motion to strike this juror because of the juror's equivocal answers about whether he could render a guilty verdict in a case involving the death penalty.  We find no manifest error in the court's decision.  Yeatts v. Commonwealth, 242 Va. 121, 134, 410 S.E.2d 254, 262 (1991) (trial court's exclusion of prospective juror will not be disturbed on appeal absent manifest error).

During voir dire, the circuit court asked prospective juror Williams if he could sentence someone in a case in

23

which one of the possible punishments is the death penalty. The juror responded that he did not know whether he could. Questioning by the Commonwealth revealed that this juror had a cousin who had been convicted of murder and sentenced to a term of imprisonment. When asked again whether he could listen to aggravating and mitigating evidence during the penalty phase of the trial and then decide whether to vote for life imprisonment or the death penalty based on that evidence, prospective juror Williams repeated that he did not know if he could. He acknowledged that the situation with his cousin could affect his ability to make a decision in this case.

During subsequent questioning by Green's counsel, this juror could not say whether there could ever be a case so heinous that he could impose the death penalty. Green's counsel then asked the following questions:

> Q. In this particular case, are you willing-if called as a juror-to listen to all of the evidence at the trial and then at the sentencing, and then come up with a decision as to whether to vote death or life imprisonment? Are you willing to do that as your duty, your civic duty as a juror?
>
> A. I don't want to, but I'll do it.
>
> Q. But you will?
>
> A. Yeah.
>
> Q. And you can come up with a decision?

24

A.  I think I can.

The voir dire of prospective juror Williams concluded with the following exchange between him and the Commonwealth:

> Q.  Mr. Williams, I want you to look at Mr. Green there.
>
> (The prospective juror complied)
>
> All right.  With what you have told us, could you under any circumstances vote to give him the death penalty?  I know it puts you on the spot and I apologize for it, but under any circumstances, could you vote to give him the death penalty?
>
> A.  Right now?  I mean, right now, no.
>
> Q.  I understand that.  Can you imagine any– is there any amount of evidence that I could put before you, would anything–with the way you feel now, would anything change your mind?
>
> A.  No.

A prospective juror is properly excused for cause when that person's views concerning the death penalty would substantially impair or preclude the performance of his or her duty in accordance with the court's instructions and the juror's oath.  Schmitt v. Commonwealth, 262 Va. 127, 139, 547 S.E.2d 186, 195 (2001), cert. denied, 534 U.S. 1094 (2002); Barnabei v. Commonwealth, 252 Va. 161, 173, 477 S.E.2d 270, 277 (1996).  In applying this principle on

25

appeal, we recognize that a trial court is in a better position to determine whether a particular juror would be impaired or prevented in performing the duties of a juror because that court has seen and heard the juror's responses to relevant questions. Lovitt v. Commonwealth, 260 Va. 497, 510, 537 S.E.2d 866, 875 (2000), cert. denied, 534 U.S. 815 (2001). Thus, we accord deference to a trial court's decision to retain or excuse a juror. Id.; Schmitt, 262 Va. at 139, 547 S.E.2d at 195.

Based on prospective juror Williams' responses during voir dire, the circuit court correctly excused this juror for cause. The juror's ability to follow the court's instructions and to perform his duties in accordance with his oath was obviously impaired. In short, prospective juror Williams never indicated that he could listen to the evidence and actually reach a decision about whether to impose the death penalty or a term of imprisonment for life. See LeVasseur, 225 Va. at 583, 304 S.E.2d at 654 (juror who stated, "I don't know if I could be party to [the death penalty] or not[, t]here is some doubt in my mind[,]" was properly excused for cause).

### 5. JUROR YOUNG

The Commonwealth asked the following question during the voir dire of prospective juror Young:

26

> Q. You may hear evidence in the case of one or more crimes committed by this defendant on August 21st, 1998, other than the capital murder for which he is convicted--I mean for which he's on trial. The [c]ourt will instruct you as to the purpose for which you can consider those other crimes. Would you be able to follow the Judge's instructions in how you view that other evidence?

Because of the Commonwealth's misstatement "other than the capital murder for which he is convicted," Green claims that the circuit court should have excused this juror for cause on the court's own motion pursuant to Rule 3A:14(b). However, when the voir dire of juror Young was completed, the court asked both parties if they had any motions regarding this juror. Counsel for Green responded, "No, sir." After each side exercised its peremptory strikes and juror Young was selected to serve in the case, the court asked counsel for both parties, "[I]s that your jury?" Green's counsel stated, "Yes, sir." The court then directed the clerk to administer the oath to the jury. Because Green failed to raise any objection either during the voir dire of prospective juror Young or before she was empanelled and sworn as a juror to hear the case, he has waived the argument that he now presents on appeal. Rule 5:25; see also Beavers v. Commonwealth, 245 Va. 268, 278, 427 S.E.2d 411, 418-19 (1993); Spencer v. Commonwealth, 238 Va. 295, 306-07, 384 S.E.2d 785, 793 (1989). The fact that

27

Rule 3A:14(b) authorizes a trial court to excuse a juror for cause on its own motion does not relieve a defendant from complying with the requirements of Rule 5:25.

## C. GUILT-PHASE ISSUES

### 1. TESTIMONY OF FORENSIC PATHOLOGIST

Green asserts that the circuit court erred in overruling his motion for a mistrial that he made after the forensic pathologist, Dr. Abrenio, referred to his testimony "in the previous case."  The statement at issue is found in the following exchange between the Commonwealth and Dr. Abrenio:

> Q.  When you say bleeding into the thoracic cavity, what are you referring to?
>
> A.  I'm referring to the lethal wound to the lungs and blood flow into the chest cavity.
>
> Q.  All right.  Is that actually into the lung or into the space around the lung?
>
> A.  Into the space around the lung.  And this was lethal.  The reason for this, as I testified in the previous case-shall I repeat?
>
> Q.  The reason for this was what?  You said That the blood-

In response to Green's motion for a mistrial, the Commonwealth suggested that the court give a cautionary instruction to the jury, but Green rejected that suggestion.  The circuit court then noted that the jurors

28

knew that there had been a previous trial because they were being told that Green had been convicted of robbery.[6]  The court described Dr. Abrenio's comment as "quick" and questioned whether the jury had paid any attention to it.

The court subsequently overruled the motion for a mistrial.  In doing so, the court explained that great care had been exercised in selecting the jury in order to insure the jurors' lack of knowledge regarding Green's prior capital murder trial.  The court then stated:

> This comment coming from a medical examiner testifying about the cause of death was a lead into what he was actually talking about, to his actual point.  The [c]ourt would have to assume that the jurors know much more than voir dire indicated for this unsolicited phrase to have any effect, therefore, the motion for a mistrial is denied.

We agree with the circuit court's conclusions. Contrary to Green's assertion, Dr. Abrenio's reference to his prior testimony did not signal the jury that Green had been previously convicted for the capital murder of Mrs. Vaughan.  Thus, Green's reliance on our decision in Barker v. Commonwealth, 230 Va. 370, 375, 337 S.E.2d 729, 733

---

[6] During opening statements, Green's counsel advised the jury that Green had already been found guilty of robbery.  Just before the Commonwealth rested its case, a stipulation was admitted into evidence, stating that, on June 22, 2000, in the Brunswick County Circuit Court, Green had been convicted of the August 21, 1998 robbery of the Vaughans' grocery store.

29

(1985) (holding that a venire person who knew of the defendant's prior conviction of the same offense for which he was being retried could not sit as a juror), is misplaced. Although Dr. Abrenio did not elaborate on the context in which he had previously testified, the jury already knew, based on defense counsel's opening statement, that Green had been convicted of the robbery of the Vaughans' grocery store. With that information, the jury could have reasonably inferred that Dr. Abrenio was referring to his testimony in that trial, irrespective of whether such testimony would have been relevant.

The decision whether to grant a motion for mistrial lies within a trial court's exercise of discretion. Burns v. Commonwealth, 261 Va. 307, 341, 541 S.E.2d 872, 895, cert. denied, 534 U.S. 1043 (2001); Beavers, 245 Va. at 280, 427 S.E.2d at 420. "When a motion for mistrial is made, based upon an allegedly prejudicial event, the trial court must make an initial factual determination, in the light of all the circumstances of the case, whether the defendant's rights are so 'indelibly prejudiced' as to necessitate a new trial." Spencer v. Commonwealth, 240 Va. 78, 95, 393 S.E.2d 609, 619 (1990) (quoting LeVasseur, 225 Va. at 589, 304 S.E.2d at 657). Unless we can say that the

trial court's determination was wrong as a matter of law, we will not disturb its judgment on appeal.  Id.

Considering Dr. Abrenio's brief reference to his prior testimony in the context in which it occurred in this case, we cannot say that the circuit court's refusal to grant a mistrial was wrong as a matter of law.  Green's rights were not "indelibly prejudiced."  Id.  Thus, we will not disturb the court's decision.

### 2. ADMISSION OF EVIDENCE SEIZED DURING EXECUTION OF SEARCH WARRANT

At trial, Green objected to the admission of evidence seized during the search of his home, specifically the "makeshift target," the empty cartridge casings, and the bullets found in the tree trunk.  He argued that there was no connection between that evidence and the evidence that was recovered from the crime scene and from Mrs. Vaughan's body during the autopsy.  Thus, according to Green, the evidence found at his residence was irrelevant, and its probative value was substantially outweighed by its tendency to cause unfair prejudice.  He now assigns error to the circuit court's ruling allowing the admission of that evidence and makes the same argument on appeal.

One of the issues at trial was whether Green intended to shoot Mrs. Vaughan or whether the "pistol went off," as

Green stated to a police investigator.  The issue of premeditation was a focal point in his counsel's opening and closing remarks.  The fact that the bullets found in the tree trunk and those recovered from Mrs. Vaughan's body were fired from one weapon established not only a nexus between the evidence but also the fact that Green had previously fired the weapon he later used to shoot Mrs. Vaughan.[7]  That fact, along with the "makeshift target" and the empty cartridge casings, suggests that Green knew how to shoot that particular firearm and was thus pertinent to the issue whether the "pistol went off."  "Evidence is relevant if it tends to prove or disprove, or is pertinent to, matters in issue."  Clay v. Commonwealth, 262 Va. 253, 257, 546 S.E.2d 728, 730 (2001).  Thus, we conclude that the evidence seized during the search of Green's house was relevant to the issue of premeditation and that the circuit court, therefore, did not abuse its discretion in admitting the evidence.

---

[7] Green had purchased a Lorcin L-25 semi-automatic pistol on July 13, 1998.  Forensic testing on six empty cartridge casings found on the floor of the Vaughans' grocery store indicated that four of those cartridge cases were sufficiently marked to conclude that "[f]irearms that produce class characteristics like those present on these cartridges cases include, but are not limited to, pistols with the brand names of Bryco and Lorcin chambered to fire caliber 25 Auto cartridges."  As a result of forensic

4. SUFFICIENCY OF EVIDENCE REGARDING CAPITAL MURDER

At the close of the Commonwealth's evidence, Green moved to strike the evidence regarding capital murder on the basis that the Commonwealth had failed to prove that the killing of Mrs. Vaughan was willful, deliberate, and premeditated. In support of his motion, Green relied primarily on his statement to a police investigator in which he had maintained that he only intended to commit a robbery and never meant to kill anyone. The circuit court denied Green's motion, finding that the evidence established that Green entered the grocery store and "said nothing before shooting; that he killed, wounded and then robbed; and that he did not bother to wear a mask which he had prepared." Green assigns error to the court's ruling and makes the same argument here as he made before the circuit court.

Premeditation is an intent to kill that needs to exist only for a moment. Peterson v. Commonwealth, 225 Va. 289, 295, 302 S.E.2d 520, 524 (1983). It is generally a factual issue. Schmitt, 262 Va. at 143, 547 S.E.2d at 197; Clozza v. Commonwealth, 228 Va. 124, 134, 321 S.E.2d 273, 279 (1984). When reviewing the sufficiency of evidence on a

_____

testing, the same conclusion was reached regarding eight of the empty cartridge casings found in Green's yard.

33

question of fact, we consider the evidence in the light most favorable to the prevailing party below, in this case the Commonwealth, and accord that party's evidence all reasonable inferences.  Beavers, 245 Va. at 281, 427 S.E.2d at 421.

Here, the evidence showed that Green entered the Vaughans' grocery store and shot Mrs. Vaughan without any warning.  After his cousin seized the bank bag containing the cash and exited the store, Green walked over to where Mrs. Vaughan was lying on the floor and fired two more shots in her direction.  Green did not leave the store until his gun was empty.  These facts clearly establish premeditation.  See Remington v. Commonwealth, 262 Va. 333, 353, 551 S.E.2d 620, 632 (2001) (stabbing victim eight to ten times established premeditation), cert. denied, 535 U.S. 1062 (2002).  Thus, we find no error in the circuit court's refusal to strike the Commonwealth's evidence regarding capital murder.

### D. PENALTY-PHASE ISSUES

### 1. TESTIMONY OF DEPUTY WESSON

During Deputy Kevin Wesson's penalty phase testimony, he stated that, when he worked for a store selling electronic devices, Mrs. Vaughan inquired about having a security system installed at the Vaughans' grocery store.

34

According to Deputy Wesson, Mrs. Vaughan was concerned because of a robbery and murder that had occurred at a store in a neighboring county and was fearful that the same kind of crime could happen at the Vaughans' store.

Green claims that this testimony violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States and the equivalent provisions of the Constitution of Virginia.  However, Green did not object to Deputy Wesson's testimony at trial.  Thus, he is barred from raising this claim for the first time on appeal.  Rule 5:25.

## 2. SUFFICIENCY OF EVIDENCE OF VILENESS AND FUTURE DANGEROUSNESS

Green asserts that the circuit court erred in overruling his motion to strike the Commonwealth's evidence regarding both the "vileness" and "future dangerousness" predicates and also in overruling his motion to set aside the jury verdict fixing the death penalty.  As to the "vileness" factor, Green argues that, since three of the four gunshot wounds sustained by Mrs. Vaughan were lethal, she died almost instantaneously without any other battery to her.  He also relies on the forensic pathologist's testimony that Mrs. Vaughan died within "seconds to minutes" after she was first shot.  Thus, in Green's view,

the Commonwealth failed to prove either an aggravated battery to the victim or depravity of mind of the defendant.

He also contends that the Commonwealth failed to establish beyond a reasonable doubt that Green would probably commit criminal acts of violence in the future that would constitute a continuing serious threat to society. According to Green, the testimony of Dr. Sautter and Dr. Pasquale established that Green would not be a future danger if confined to prison. Green points to Dr. Sautter's opinion that Green's behavior would be appropriate in a maximum-security situation and to Dr. Pasquale's statement that, in a prison setting, the risk of misbehavior by Green would be low. In asserting that the Commonwealth failed to establish the "future dangerousness" predicate, Green also relies on the fact that he had no record of convictions for criminal offenses that pre-dated the present offenses involving the Vaughans. Finally, he characterizes the Commonwealth's evidence of unadjudicated prior bad acts as "'benign' run-ins with friends, family and employers."

With regard to the "vileness" predicate, the term "aggravated battery" means "a battery which, qualitatively and quantitatively, is more culpable than the minimum

necessary to accomplish an act of murder." Smith v. Commonwealth, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978). Contrary to Green's assumption that Mrs. Vaughan died instantly, the forensic pathologist stated that he could not determine in what sequence Green had fired the four gunshots at Mrs. Vaughan. He did opine, however, that the bullet that penetrated two lobes of her right lung caused hemorrhaging in the thoracic cavity, the effect of which he likened to suffocation. "A killing inflicted by multiple gunshot wounds . . . when there is an appreciable lapse of time between the first shot and the last, and when death does not result instantaneously from the first" constitutes an "aggravated battery." Sheppard v. Commonwealth, 250 Va. 379, 392, 464 S.E.2d 131, 139 (1995). Likewise, multiple gunshot wounds, any one of which could have been fatal, constitute an "aggravated battery." Walker v. Commonwealth, 258 Va. 54, 71, 515 S.E.2d 565, 575 (1999).

We have construed the term "depravity of mind" to mean "a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation." Smith, 219 Va. at 478, 248 S.E.2d at 149. Green's conduct established "depravity of mind" when he repeatedly shot Mrs. Vaughan in front of her husband and left them both to die merely so he could

37

rob them.  The killing of Mrs. Vaughan was unprovoked and Green showed no mercy for her when he walked back over to where she was lying on the floor and emptied his gun at her.  See Walker, 258 Va. at 72, 515 S.E.2d at 575-76.  Thus, we conclude that the circuit court did not err in refusing to strike the Commonwealth's evidence or to set aside the jury verdict finding the aggravating "vileness" factor.

As to the "future dangerousness" predicate, we reach the same conclusion.  The circumstances surrounding the murder of Mrs. Vaughan, including the shooting of Mr. Vaughan, are alone sufficient to establish Green's future dangerousness.  See Code § 19.2-264.4(C) (future dangerousness can be based on "the circumstances surrounding the commission of the offense"); Kasi v. Commonwealth, 256 Va. 407, 423, 508 S.E.2d 57, 66 (1998).  In addition, Cleaton, an acquaintance of Green, testified that Green had threatened to rob and kill him and had shot in Cleaton's direction on one occasion even though Cleaton had specifically asked Green not to do so.  Cleaton also stated that he had heard Green threaten to rob a man selling ice cream.  Finally, several correctional officers who had supervised Green's incarceration testified about

38

Green's disruptive behavior and his threats to the officers.

### E. ISSUES ALREADY DECIDED

Several of Green's assignments of error concern issues that this Court has already decided adversely to the position he now advances.  Green has offered no reason why we should depart from our precedents.  Thus, we affirm our prior holdings and find no merit in the following assignments of error:

1. The trial court erred in overruling the defendant's motion to declare Virginia's death penalty statutes unconstitutional.  Green makes only a generalized argument on this issue.  We have rejected numerous specific challenges to the constitutionality of Virginia's death penalty statutes in Beck v. Commonwealth, 253 Va. 373, 387, 484 S.E.2d 898, 907 (1997); Breard, 248 Va. at 74-75, 445 S.E.2d at 675; Mickens v. Commonwealth, 247 Va. 395, 403, 442 S.E.2d 678, 684 (1994); Satcher v. Commonwealth, 244 Va. 220, 227-28, 421 S.E.2d 821, 826 (1992); Watkins v. Commonwealth, 238 Va. 341, 352, 385 S.E.2d 50, 56 (1989); Spencer, 238 Va. at 280-81, 384 S.E.2d at 777-78; and Smith, 219 Va. at 471-79, 248 S.E.2d at 145-49.

2. The trial court erred in overruling the defendant's motion for a bill of particulars.  Initially, we note that

the circuit court granted Green's motion in part.  To the extent that he now argues that he was entitled to a bill of particulars providing a "narrowing" construction of the "vileness" predicate and listing all the evidence that the Commonwealth intended to rely upon at sentencing, we have rejected such arguments in Goins v. Commonwealth, 251 Va. 442, 454, 470 S.E.2d 114, 123 (1996); and Strickler, 241 Va. at 490, 404 S.E.2d at 233, respectively.

3. The trial court erred in overruling the defendant's motion to preclude the Commonwealth from using evidence of unadjudicated acts at sentencing.  Although the circuit court denied Green's motion, the court stated in its order that it would review each unadjudicated act for its relevance to the issue of future dangerousness and its probative value versus its prejudicial effect.  This Court has rejected Green's arguments in Walker, 258 Va. at 64-67, 515 S.E.2d at 571-73; Williams v. Commonwealth, 248 Va. 528, 536, 450 S.E.2d 365, 371 (1994); and Stockton v. Commonwealth, 241 Va. 192, 209, 402 S.E.2d 196, 206 (1991).

4. The trial court erred in denying the defendant's motion for additional peremptory challenges.  We have rejected this claim in Spencer, 240 Va. at 84, 393 S.E.2d at 613; Buchanan, 238 Va. at 405, 384 S.E.2d at 767; and

40

O'Dell v. Commonwealth, 234 Va. 672, 690, 364 S.E.2d 491, 501 (1988).

5. The trial court erred in denying the defendant's motion for that court to conduct a proportionality review. As we have already ruled, nothing in Code § 17.1-313(E) requires a trial court to conduct such a review, Bailey, 259 Va. at 742, 529 S.E.2d at 581, and the circuit court in this case did not abuse its discretion in refusing to do so. See id.

6. The trial court erred by overruling the defendant's motion to introduce evidence regarding conditions of imprisonment for life in rebuttal to the Commonwealth's evidence of the defendant's future dangerousness. We have rejected all Green's arguments on this issue in Bell, 264 Va. at 199, 563 S.E.2d at 713; Burns, 261 Va. at 338-40, 541 S.E.2d at 892-93; Lovitt, 260 Va. at 517, 537 S.E.2d at 879; and Cherrix v. Commonwealth, 257 Va. 292, 309-10, 513 S.E.2d 642, 653-54 (1999). We further note that the circuit court denied Green's motion only "to the extent that it exceeds evidence of [Green's] previous adjustment to incarceration."

## F. STATUTORY REVIEW

As with every case involving the imposition of the death penalty, we must determine whether the death sentence

41

in this case was imposed under the influence of passion, prejudice, or other arbitrary factors.  Code § 17.1-313(C)(1).  Green does not claim that any specific passion or prejudice affected the sentencing decision.  Upon reviewing the record, we find no evidence that any such factor was present in this case or influenced either the jury's or the circuit court's sentencing decision.

We are also required by the provisions of Code § 17.1-313(C)(2) to determine whether Green's sentence of death is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."  Because of the statutory directive that we compare this case with "similar cases," we have focused on cases in which an individual was murdered during the commission of robbery and the death penalty was imposed upon a finding of both aggravating factors.  Our proportionality review includes all capital murder cases presented to this Court for review and is not limited to selected cases.  See Burns, 261 Va. at 345, 541 S.E.2d at 896-97.  Based on that review, we conclude that Green's sentence of death is not excessive or disproportionate to sentences generally imposed in this Commonwealth for capital murders comparable to Green's murder of Mrs. Vaughan, and we cite the following cases as examples:

42

<u>Akers v. Commonwealth</u>, 260 Va. 358, 535 S.E.2d 674 (2000), <u>cert. denied</u>, 531 U.S. 1205 (2001); <u>Stout v. Commonwealth</u>, 237 Va. 126, 376 S.E.2d 288 (1989); <u>Poyner v. Commonwealth</u>, 229 Va. 401, 329 S.E.2d 815 (1985); and <u>Edmonds v. Commonwealth</u>, 229 Va. 303, 329 S.E.2d 807 (1985).

In reaching this conclusion, we have considered Green's argument that the death penalty in this case is disproportionate because the Commonwealth failed to show that Mrs. Vaughan endured prolonged suffering before she died and because Green had no criminal convictions prior to this offense. He thus claims that this case involved "less aggravation" than many other cases in this Commonwealth in which death sentences have been imposed. We do not agree and reiterate that the purpose of our proportionality review "is to reach a reasoned judgment regarding what cases justify the imposition of the death penalty." <u>Orbe v. Commonwealth</u>, 258 Va. 390, 405, 519 S.E.2d 808, 817 (1999). We do not "insure complete symmetry." <u>Id.</u>

### III. CONCLUSION

For the reasons stated, we find no error in the judgment of the circuit court or in the imposition of the death penalty. We also perceive no reason warranting commutation of the death penalty in this case. Thus, we will affirm the judgment of the circuit court.

43

<u>Affirmed</u>.