Present: Hassell, C.J., Koontz, Kinser, Goodwyn, and Millette, JJ., and Carrico and Lacy, S.JJ.

DONNA L. BLANTON

                                        OPINION BY
v.  Record No. 091878          SENIOR JUSTICE HARRY L. CARRICO
                                     September 16, 2010
COMMONWEALTH OF VIRGINIA


                FROM THE COURT OF APPEALS OF VIRGINIA

    In this appeal involving convictions for murder in the first degree (Code § 18.2-32) and use of a firearm in the commission of a felony (Code § 18.2-53.1), we decide whether the circuit court erred in failing to hold that the prosecutor made improper statements during his rebuttal to the closing argument of the defense.  Finding that the circuit court did not err, we will affirm the judgment of the Court of Appeals of Virginia.

    The record shows that in the early morning hours of October 16, 2003, Taylor Blanton (Taylor), a Virginia State Trooper, was shot and killed while still in bed in his home located on approximately twelve acres of land at Ruther Glen in Caroline County.  His wife, Donna L. Blanton (Donna), was charged with the murder and weapon offenses, and she was convicted of both by a jury in the Circuit Court of Caroline County.

    In an unpublished opinion, the Court of Appeals reversed both convictions and remanded the case to the circuit court, holding that the trial court erred in permitting the Commonwealth to use all of its peremptory strikes against five

white females without supplying a gender-neutral reason. Blanton v. Commonwealth, Record No. 1955-05-2, slip op. at 6 (April 17, 2007). Upon remand, the circuit court ordered a change of venue to the Circuit Court of the City of Virginia Beach.

In a jury trial held in Virginia Beach, Donna was convicted of both offenses, and the jury fixed her punishment at life imprisonment and a fine of $100,000 on the murder charge and three years imprisonment on the weapons charge. The circuit court imposed the sentences fixed by the jury and entered its final order on September 3, 2008.

In a per curiam order, a judge of the Court of Appeals refused Donna's petition for appeal, and a three-judge panel of the court by order upheld the refusal for the reasons stated in the order. We awarded Donna this appeal.

BACKGROUND

Donna and Taylor began dating after she was divorced from her former husband, Glen Udart, and in 1999 she moved into Taylor's home. Donna and Taylor were married about four years later, on April 14, 2003.

According to the story Donna told at the time, she arose before Taylor about 6:00 a.m. on the morning of October 16, 2003, and she was in the bathroom when she heard gunshots. She exited the bathroom and called 911. She reported that an

intruder had broken into her home and shot her husband. When police arrived, Donna stated that she was in the bathroom brushing her teeth[*] when she heard gunshots and that she exited the bathroom and saw the intruder running out of the house. She said that the intruder dropped his gun on the bedroom floor and that she picked it up and fired it at the intruder as he was running down the driveway. She then placed the gun on the center island in the kitchen.

Police retrieved the gun from the center island in the kitchen when they arrived. They recovered six shell casings from the bedroom, which was located on the first floor of the house, two shell casings from the yard outside, and two bullets from the bedroom. Four more bullets were found in Taylor's body during an autopsy. He died from "gunshot wounds of the back."

Forensic analysis determined that all the bullets and shell casings had been fired from the gun retrieved from the center island in the kitchen. In addition, the gun perfectly fitted into an imprint in a towel found in a linen closet outside the bedroom door. The gun had actually been purchased by Taylor and used at a state police firing range for several years prior to his death.

---

[*] Later the same day, Taylor's sister, Debbie Thomas, arrived on the scene and Donna asked her for "a mint or a piece of gum because she had not brushed her teeth all day."

Police investigation disclosed nothing indicating the entry of an intruder into the residence on the morning in question. The first officer to arrive saw no tracks other than his own in the heavy dew on the ground. There were no signs of forced entry. One window was open some three or four inches above the sill but a cobweb was intact in the open space and there were no signs inside or on the ground below the window of anything out of order. No door or window in the house appeared to be damaged and there was no dirt on any floor.

The Blanton family kept three dogs in their household that "barked at anybody[,]" including "[f]amily members, . . . [e]verybody" who "came to the door" or "walked on the driveway." On the morning in question, no one heard the dogs bark until the police arrived on the scene in response to Donna's 911 call.

The record discloses that Donna experienced serious difficulty with her finances. She was employed for about three years by a community action program in Caroline County but was "fired" on July 9, 2002, for "gross insubordination." She filed a claim against the agency with the Equal Employment Opportunity Commission, which determined on March 30, 2003 that the claim was "not founded."

Before Taylor and Donna were married, they engaged in conversations at softball games with his ex-wife, Julie Henry, with whom they were on friendly terms. The two women also

4

talked frequently on the telephone, and Donna told Julie Henry she was expecting a settlement for the loss of her prior employment.  In one conversation before Donna's marriage, she was crying and stated that Taylor "wanted her to spend [the settlement money] fixing up [his] house . . . and since they weren't married . . . she didn't think that she should have to spend that money on the house."  In a conversation after Donna's marriage, she "seemed . . . aggravated" about not having a joint checking account with Taylor and said "she was going to do something about that."

Donna told two other friends, Nancy Barnett and Susan Jenkins, that she had filed a lawsuit against her former employer, had won the case, and was expecting to receive her money soon.  Donna told Taylor's nephew, John Thomas, that she would be receiving "an undisclosed settlement . . . large in nature" as a result of her discharge by her former employer and that she and Taylor talked about using the money she expected from the settlement to purchase "a beach house in Nags Head as well as a new tractor for Taylor."  Yet there was never any settlement, there was never any lawsuit, and Donna never got "a penny out of" her former employer.

In August 2003, Taylor purchased a John Deere tractor from a local equipment dealer.  He paid a deposit of $200.00 and said he would pay the balance later.  The tractor was delivered to

5

his home.  On August 27, he gave the dealer a check for $16,644.56 drawn on SunTrust Bank and signed by Donna.  Taylor asked that the check be held for a few days, when the funds would be available to pay it.  The dealer talked with Donna several times in September of 2003 and she kept saying she would soon be receiving funds to cover the check.  She also said that Taylor was "getting upset and blaming her" for the delay in paying the money.

The dealer finally cashed the check, and it was returned on September 14 for insufficient funds in the bank to cover it. The dealer notified Taylor that the check had been returned and Taylor delivered to the dealer a faxed copy of a letter supposedly from SunTrust Bank, purportedly signed by one "R. Montgomery," and stating that the funds from a cancelled cashier's check dated October 6, 2003, would be deposited in Donna's account by October 10.  The dealer never received anything from the bank.

On October 14, 2003, Donna called the dealer and said she was leaving the bank and was on the way to the dealer's office to pay in full for the tractor.  The dealer never saw or heard from Donna again and never received any money and therefore repossessed the tractor with the full purchase balance still unpaid.  It turned out that SunTrust Bank had no one on its staff named "R. Montgomery," that the letterhead on which the

6

faxed letter was written was not something used by SunTrust Bank, and that the handwriting on the letter was Donna's.

Donna was involved in gambling. Taylor's daughter, Katherine, who lived in the Blanton household, saw Donna on the computer "[a]ll the time" with "casino gambling games" on the screen. When Donna heard Katherine coming, she "minimize[d]" the screen "so [one] can't see" what is on it.

Donna traveled to Atlantic City, New Jersey, to gamble. She told her friend Nancy Barnett, who accompanied her there "a time or two," that "she was real lucky" and would "win a lot." She told her friend Susan Jenkins, who was asked by Donna to accompany her to Atlantic City but "never did get to go," that "she was a high roller and that she would call a man there at the casino any time she wanted to go up; and he would have a suite ready for her, a limousine, [and] tickets to any show she wanted to go to."

If Donna ever won "a lot" at gambling, it obviously was not sufficient to keep her out of financial trouble. When she moved into Taylor's home, her two daughters from her previous marriage, Chelsea and Danielle Udart, also moved. They used one of the two bedrooms on the second floor and Taylor's daughter, Katherine, used the other. Taylor also had a son, but he lived with his mother.

On weekdays in the spring of 2003, when Chelsea and Danielle arrived home from school, one of them would collect the mail and then await a call from Donna.  She had them go through the mail and read off the return address on each piece and she would instruct the girls where the mail should be placed.  She would have them hide "specific pieces" of mail, such as those from credit card companies and banks, in her briefcase, which she kept under the television table in her bedroom.  After Taylor's murder, the police found batches of Donna's financial records in three other places, her purse, a briefcase in her automobile, and under female clothing in a dresser drawer.

The hiding of mail abated during the summer months of 2003, but when Chelsea arrived home one summer day she found a "warrant in debt, judgment, and garnishment summons" for Donna posted on the front door of the Blanton home.  The hiding of mail began again in the fall of 2003.  Danielle estimated that she placed 250 to 300 pieces of mail in Donna's briefcase in the fall of 2003.

Donna told Danielle "every day" not to "tell anybody" about hiding the mail "because bad things would happen."  When Danielle asked "what would happen," Donna stated that Taylor "would find out . . . there would be a divorce," and "we would be homeless and penniless."

Donna also placed "[q]uite a few" mail hold cards at the post office in Ruther Glen. These cards permitted customers to have mail held from three to thirty days. Donna visited the post office on occasion to pick mail up and at other times to place new holds. Taylor did not visit the post office.

During several months preceding Taylor's murder, Donna wrote a series of checks that were all returned by the bank for insufficient funds. For the entire month of September 2003, she had a negative balance in her checking account, and the bank closed the account on October 3, 2003. In May of 2003, Donna entered into a series of payday loans, which were payable on the next payday and which she had "going until a loan was defaulted [i]n late October" 2003.

There was little Donna could have done in October of 2003 to improve her financial situation. She had received a discharge in bankruptcy in May of 1998 and would not have been eligible to receive another discharge for six years, or until May 2004.

On the evening of Taylor's viewing after his death, Donna telephoned Julie Henry, Taylor's ex-wife, and asked about his two children. Julie Henry stated that they "weren't doing that well." Donna replied: "Well, they'll be okay. They'll get Taylor's Social Security, they'll go to school for free and they'll get lots of money because he was killed in the line of

9

duty."  When Julie Henry said she could not see how Taylor's death could be deemed to have been in the line of duty, Donna responded:  "What else could it be?"  And on the day of Taylor's funeral, she told her daughters, Chelsea and Danielle, "[w]ell, at least you'll have your own rooms now."

Finally, we note one of the conversations Taylor and Donna had with Julie Henry at a softball game shortly before his marriage to Donna.  He stated that "if he died Donna would be a rich woman."

Donna did not testify at trial.

ANALYSIS

In his rebuttal to defense counsel's closing argument, the prosecutor made two statements that are the subjects of four assignments of error made by Donna.  Assignments 1 and 2 relate to the first statement and 3 and 4 to the second statement.

The First Statement

The prosecutor said this to the jury:

The defense did put in some evidence.  They put in the three lab reports, and they had all of this here.  You better believe that if there were one shred of evidence in all of this that proved that the defendant was not guilty that [defense counsel] would have presented it to you, and he didn't.

Donna objected to the argument, and the circuit court overruled the objection.  Donna now argues that the prosecutor's

10

statement "was an improper comment on the Defendant's failure to present evidence, including [her] failure to testify."

However, we do not reach the merits of Donna's argument in support of her first two assignments of error. "Unless a defendant has made a timely motion for a cautionary instruction or for a mistrial, we will not consider [her] assignments of error alleging that improper remarks were made by the prosecutor." Schmitt v. Commonwealth, 262 Va. 127, 148, 547 S.E.2d. 186, 200 (2001); see also Sheppard v. Commonwealth, 250 Va. 379, 394-95, 464 S.E.2d 131, 140-41 (1995); Breard v. Commonwealth, 248 Va. 68, 82, 445 S.E.2d 670, 679 (1994); Cheng v. Commonwealth, 240 Va. 26, 38, 393 S.E.2d 599, 605-06 (1990).

Donna did not make a motion in the circuit court for a cautionary instruction or for a mistrial. Hence, she has waived any claim of error she may have had with respect to the First Statement. Rule 5:25; see, e.g., Schmitt, 262 Va. at 148, 547 S.E.2d at 200-01 (2010).

The Second Statement

In his closing argument, defense counsel stated that after Taylor's funeral, Donna returned to the house she and Taylor had lived in but she was arrested within seven days and did not receive the house nor did she get "one penny" as a result of Taylor's death. In rebuttal, the prosecutor made this statement: "She was in jail ten days after [Taylor's death]

11

happened.  That's why she didn't get one penny.  That's why she didn't get the house."

Defense counsel objected to the prosecutor's reference to Donna's presence in jail and moved for a mistrial or a curative instruction.  Defense counsel likened the comment about Donna being in jail to allowing an accused to appear before a jury while in shackles or prison garb and, hence, was "overly prejudicial."

The trial judge remarked that defense counsel had "sort of opened that door" by his statement that Donna had been arrested seven days after Taylor's murder.  The prosecutor stated that he had not said that Donna had "been in jail continuously since that time," only that she was in jail ten days after the murder. The prosecutor also said he may have misstated the number of days as ten rather than seven between the murder and the arrest.

The circuit court denied the defense motion for a mistrial. However, the trial judge reminded the jurors that he had previously instructed them that "what the attorneys say is not evidence," that it "is only their recollection of the evidence," that "[y]ou are the triers of fact," and "[y]ou heard the evidence based upon your collective memories as to what, in fact, is the evidence."

Resuming his rebuttal argument, the prosecutor stated to the jury:  "Let me correct myself.  Of course, she didn't get

12

the house.  Of course, she didn't get any money.  She was arrested for the murder of Taylor Blanton seven days after he was murdered."

We hold that the circuit court did not err in denying defense counsel's motion for a mistrial.  The denial is supported by established principles of law, as follows:

> The decision whether to grant a motion for mistrial lies within a trial court's exercise of discretion.  When a motion for mistrial is made, based upon an allegedly prejudicial event, the trial court must make an initial factual determination, in the light of all the circumstances of the case, whether the defendant's rights are so indelibly prejudiced as to necessitate a new trial.  Unless we can say that the trial court's determination was wrong as a matter of law, we will not disturb its judgment on appeal.

Green v. Commonwealth, 266 Va. 81, 102, 580 S.E.2d 834, 846 (2003) (citations and internal quotation marks omitted).

We cannot say that the circuit court's determination was wrong as a matter of law.  Considering the innocuous nature of the prosecutor's comment under all the circumstances of the case, the circuit court's cautionary instruction to the jury, and the prosecutor's corrective statement, Donna's rights were clearly not so indelibly prejudiced as to necessitate a new trial.  Accordingly, we will not disturb the circuit court's judgment.

CONCLUSION

13

For the reasons assigned, we will affirm the judgment of the Court of Appeals.

Affirmed.