COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges AtLee, Ortiz and Lorish
Argued at Richmond, Virginia


KEVIN LAMONT JONES, JR.
                                                    MEMORANDUM OPINION* BY
v.        Record No. 1412-22-2                  JUDGE RICHARD Y. ATLEE, JR.
                                                        APRIL 16, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF HENRICO COUNTY
Rondelle D. Herman, Judge

(Dannie R. Sutton, Jr.; McDonald, Sutton & DuVal, PLC, on brief),
for appellant.  Appellant submitting on brief.

William K. Hamilton, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, the Circuit Court of Henrico County convicted appellant Kevin

Lamont Jones, Jr., of unlawful wounding, in violation of Code § 18.2-51.  On appeal, Jones asserts

that the evidence was insufficient to support his conviction.  He also alleges that the trial court erred

in overruling his objection to a jury instruction offered by the Commonwealth and in denying his

motion for a mistrial.  For the following reasons, we disagree and affirm the court below.

I.  BACKGROUND

"Under familiar principles of appellate review, the facts will be stated in the light most

favorable to the Commonwealth, the prevailing party at trial."  *Lynch v. Commonwealth*, 272 Va.

204, 206 (2006).  So viewed, Jones arrived at Jamir Pettis's house after midnight to smoke

marijuana.  Pettis directed Jones to his bedroom while Pettis went to the kitchen to fetch a butter

knife to clean out his marijuana grinder.  When Pettis returned to the bedroom, Jones was standing

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

at the foot of the bed, and Pettis noticed that there was a gun on the bed. Pettis was not bothered by the presence of the gun and began to clean the grinder. Jones picked up the gun and put it in his pocket and explained that he did not want to make Pettis "nervous or scared." Pettis sat on the side of his bed and cleaned the grinder as Jones spoke with someone on the phone. Pettis surmised that the person Jones was speaking with was waiting outside the house. Jones ended his phone conversation and, about a minute later, pulled the gun out and told Pettis to be quiet and get down. Pettis stood up to walk around the bed, "grabbed" towards Jones, and the gun went off. Pettis was struck by a bullet, which traveled through his arm and his neck. They continued to scuffle, and at some point, Pettis snatched Jones's jacket and dropped it on the floor.

Henrico County Police Detective Kevin Harver responded to Pettis's home on the night of the shooting and recovered a bullet embedded in Pettis's bedroom wall. A cartridge casing and a black jacket were on the floor. Detective Harver found a pistol in the sleeve of the jacket. The pistol's slide "was locked to the rear," known as a "phase two stoppage," due to a malfunction in which the pistol attempted to feed two cartridges into the chamber at the same time. Detective Harver also found a cell phone and a neck gaiter in the jacket's pocket.

Henrico County Detective Matt Rosser interviewed Jones. Detective Rosser asked Jones where his phone was, and Jones responded that it was at his home. Jones later admitted that Detective Rosser, "might have one of [his] phones." Jones told Detective Rosser he last saw this phone "a couple of days ago" at Pettis's house. When asked what happened at Pettis's house, Jones responded, "a lot happened," but provided no further detail. Detective Rosser also obtained a buccal swab of Jones's DNA.

Virginia Department of Forensic Science Firearms Examiner Nicole Athey testified as an expert in firearm identification. Athey concluded that the bullet and cartridge casing recovered

from Pettis's bedroom were both fired from the pistol found in the sleeve of the black jacket retrieved from the floor.

Kerri Rosana, of the Virginia Department of Forensic Science, testified as an expert in forensic biology. Rosana developed a DNA profile from the buccal swab collected by Detective Rosser. She also developed a DNA profile from the neck gaiter located in the jacket pocket recovered by Detective Harver. After comparing the two profiles, Rosana determined that Jones "could not be eliminated as the major contributor to the DNA found on the neck gaiter" and stated that the probability of randomly selecting someone "who has the same DNA profile as the major contributor from the neck gaiter was one in greater than 7.2 billion"—the approximate human world population.

At trial, the Commonwealth played two phone calls Jones made to Pettis from the jail. In one of the phone calls, both Pettis and Jones referenced the fact that Jones was calling from jail. Jones encouraged Pettis not to appear in court and offered him a bribe. Jones even admitted that he pointed his gun at, and shot, Pettis. When Pettis asked why Jones pulled a gun on him, Jones responded, "cause you were being weird as a bitch, bruh." He also blamed Pettis for the shooting because Pettis "jumped at [him] while [he] had a gun in [his] hand" and claimed that "anybody with a brain" knows not to jump at someone who is holding a gun. When Pettis accused Jones of trying to justify the shooting, Jones said, "I already told you straight up. I did it. I did it . . . I'm a gangster before anything." And when Pettis said the only thing he knew was that Jones knew "how to pull a gun out and shoot," Jones responded, "you played with the wrong nigger . . . . That's your problem."

Jones testified in his defense. He denied taking a firearm to Pettis's house or shooting Pettis. He said he went to Pettis's house solely to purchase marijuana and that they had not previously met. He explained that he became uneasy when Pettis was slow to provide him with the

- 3 -

strain of marijuana he wanted, so he called his cousin for a ride home. While he waited for his cousin, someone entered the room and Pettis "jumped up for some reason." The person fired two or three shots at Pettis and then pointed the gun at Jones. The gun "clicked like as if they either didn't have any more bullets or maybe it jammed up." He claimed the gunman struck him with the gun and he fell into and broke a wall. He saw the gun on the ground and then scuffled with Pettis over it. He denied taking a firearm to Pettis's house or shooting Pettis.

Jones moved to strike the charges and argued that the evidence was insufficient to prove he acted with malice or that he intended to maim, disfigure, disable, or kill Pettis. He also argued that the evidence failed to show Pettis suffered permanent injury. The trial court found that the sufficiency of the evidence was a factual determination for the jury and denied the motion to strike.

The Commonwealth proposed a jury instruction that stated,

> If you believe from the evidence that the defendant previously made a statement inconsistent with his testimony at this trial, that previous statement may be considered by you as proof that what the defendant previously said is true.

Jones objected to the instruction on the basis that no evidence was presented he made a prior inconsistent statement to law enforcement. The Commonwealth asserted that statements he made during the jail calls were inconsistent with his testimony at trial. The trial court granted the instruction.

During closing argument, the Commonwealth argued in part that, "[t]his entire thing, ladies and gentlemen, unwrapped, unraveled in less than nineteen minutes. The Defendant came to Mr. Pettis'[s] house with a plan. Let's listen to these jails [sic] and we'll come back to that point in just a minute." Jones moved for a mistrial and argued that the Commonwealth "has just let the jury know that [he] has been in jail." The Commonwealth responded that Jones himself indicated in the calls that he was in jail. The trial court concluded that Jones made comments in the jail calls that

- 4 -

would allow the jury to infer he was in jail and found that the Commonwealth's comment was "not overly prejudicial at this stage in the arguing." The trial court denied the motion.

The jury convicted Jones of unlawful wounding and sentenced him to five years in prison. Jones moved to set aside the verdict as contrary to the law and the evidence, arguing that the evidence failed to prove he intended to maim, disfigure, disable, or kill Pettis. The trial court denied the motion. Jones now appeals.

## II. ANALYSIS

### A. *Sufficiency of the Evidence*

#### 1. Credibility

Jones first contends that the trial court erred in denying his motion to strike and in refusing to set aside the verdict. Jones argues that the evidence does not support the jury's credibility determination and concludes, based upon his testimony, that the evidence failed to prove he unlawfully wounded Pettis. We disagree and find that the evidence was sufficient to support Jones's unlawful wounding conviction.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "[T]he relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).

> If any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall . . . be guilty of a Class 3 felony. If such act be done unlawfully but not maliciously, with the intent aforesaid, the offender shall be guilty of a Class 6 felony.

Code § 18.2-51. In this case, the jury convicted Jones of the Class 6 felony. On appeal, Jones argues that the Commonwealth's witnesses were not credible and, thus, the evidence failed to prove he caused bodily injury to Jones with the requisite intent.

It is well-settled that determining the credibility of the witnesses "is within the exclusive province of the jury, which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). This Court must accept the jury's decision on the credibility of the witnesses "unless, 'as a matter of law, the testimony is inherently incredible.'" *Lambert v. Commonwealth*, 70 Va. App. 740, 759 (2019) (quoting *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006)). "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006) (quoting *Cardwell v. Commonwealth*, 209 Va. 412, 414 (1968)). "In other words, this Court cannot say a witness' testimony is inherently incredible unless it is 'so contrary to human experience as to render it unworthy of belief.'" *Lambert*, 70 Va. App. at 759 (quoting *Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011)).

We are bound by the jury's finding that Pettis was the more credible witness in this case, as there is nothing inherently incredible about his testimony. Indeed, Pettis's version of events was corroborated by Detective Harper's testimony that he found *one* bullet lodged in the wall of Pettis's bedroom, *one* cartridge casing on the floor, and a black jacket on the floor of the bedroom. The jacket concealed a pistol in the sleeve as well as a neck gaiter bearing Jones's DNA in the pocket. The bullet and cartridge casing recovered from the bedroom were fired from the pistol recovered from Jones's jacket. Photographs captured Pettis lying on the floor, bloody and with obvious bullet wounds. Moreover, in jail calls, Jones admitted to pulling a gun on Pettis, and he tried to persuade

- 6 -

Pettis not to testify. There is simply nothing inherently incredible about Pettis's testimony, and the record fully supports the jury's credibility determination.

Furthermore, the evidence failed to support Jones's version of events or to corroborate the story he told. While Jones admitted he was present in Pettis's room at the time of the shooting, he claimed that an unknown gunman burst through the door and fired two or three shots at Pettis. Not only does the forensic evidence not support that version of events, but Jones offered no explanation for why Pettis would lie about it. He also did not explain why he would struggle with Pettis over the firearm. Jones did not call for help after Pettis was shot and, instead, fled the scene. *See Speller v. Commonwealth*, 69 Va. App. 378, 388 (2018) ("Flight following the commission of a crime is evidence of guilt." (quoting *Clagett v. Commonwealth*, 252 Va. 79, 93 (1996))). Jones also did not explain the statements he made in the jail calls in which he clearly admitted to pointing a gun at Pettis and attempted to persuade him from going to court. We cannot, therefore, conclude that the jury erred in believing Pettis's account of the shooting and in concluding that Jones fabricated his story. "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Id.* Indeed, the jury "was at liberty to . . . treat such prevarications as 'affirmative evidence of guilt.'" *Sierra v. Commonwealth*, 59 Va. App. 770, 784 (2012) (quoting *Armstead v. Commonwealth*, 56 Va. App. 569, 581 (2010)). Therefore, it was not error to discredit Jones's version of events and find him guilty.

2. Accident

Jones also argues that even if Pettis's account was believable, the evidence failed to prove he intended to shoot Pettis and that the incident was entirely accidental.

"Intent is the purpose formed in a person's mind which may, *and often must*, be inferred from the facts and circumstances in a particular case." *Commonwealth v. Perkins*, 295 Va. 323, 330

(2018) (quoting *Burton v. Commonwealth*, 281 Va. 622, 626-27 (2011)). "Circumstantial evidence of intent may include the conduct and statements of the alleged offender." *Adams v. Commonwealth*, 33 Va. App. 463, 471 (2000). "It is proper for a court to consider not only the method by which a victim is wounded, but also the circumstances under which that injury was inflicted in determining whether there is sufficient evidence to prove an intent to maim, disfigure, disable or kill." *Burkeen v. Commonwealth*, 286 Va. 255, 260-61 (2013). In determining whether a defendant acted with the requisite intent, a "fact finder may infer that a person intends the immediate, direct, and necessary consequences of his voluntary acts," *Moody v. Commonwealth*, 28 Va. App. 702, 706-07 (1998), and a "fact finder is entitled to draw inferences from those facts proven to be true, so long as the inferences are reasonable and justified," *Cottee v. Commonwealth*, 31 Va. App. 546, 555 (2000). Accordingly, "when a person without any provocation strikes another with a deadly weapon . . . and thereby maims or disfigures him, he is presumed to have intended to maim or disfigure because that was the natural and probable consequence of his act." *Banovitch v. Commonwealth*, 196 Va. 210, 216 (1954).

Here, Jones brought a firearm with him to purchase marijuana well after midnight. He phoned his cousin, who appeared to be waiting outside. He then brandished his firearm and instructed Pettis to be quiet and get on the ground. When Pettis lunged at him, the gun fired and Pettis was shot, resulting in serious injuries. It is entirely foreseeable that a shooting might occur when brandishing a loaded firearm. Moreover, in jail calls, Jones admitted he shot Pettis and explained he was a "gangster before anything." He also said, "you played with the wrong nigger . . . . That's your problem." From this evidence, we conclude that the evidence sufficiently proved Jones caused bodily injury to Pettis with the intent to maim, disfigure, disable, or kill him and that the evidence supports Jones's conviction for unlawful wounding.

B. *Jury Instruction on Inconsistent Statements*

Jones next asserts that the evidence failed to prove he made an inconsistent statement and, therefore, that the trial court abused its discretion in overruling his objection to jury instruction number eight, which allowed the jury, in reaching its verdict, to consider Jones's prior inconsistent statements. We find that the evidence supported the instruction.

"A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). A jury instruction may be submitted to the jury if there is "more than a scintilla" of evidence supporting it. *Turman v. Commonwealth*, 276 Va. 558, 564 (2008). "[W]hether a jury instruction accurately states the relevant law is a question of law that we review de novo." *Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)). We review a trial court's decisions in giving and denying requested jury instructions for abuse of discretion. *Barney v. Commonwealth*, 69 Va. App. 604, 609 (2019).

The Commonwealth sought to instruct the jury that if it believed Jones previously made a statement that was inconsistent with his testimony at trial, his prior statement could be considered as proof that what he previously said was true. Jones objected and asserted that the evidence failed to show he made an inconsistent statement. He argued that his testimony at trial was entirely consistent with the statements he made to Detective Rosser. The Commonwealth responded that the statements he made in the jail calls were inconsistent with his trial testimony. We agree with the Commonwealth. At trial, Jones denied that he brought the gun to Pettis's home and testified that a different person shot Pettis. By contrast, he admitted to Pettis on the telephone that he produced the gun because he felt Pettis was "being weird as a bitch." He also admitted to shooting Pettis and chastised Pettis for jumping at him while he had a gun in his hand. On these facts, the trial court

reasonably concluded that the instruction was supported by more than a scintilla of evidence. Consequently, the trial court did not abuse its discretion in granting the instruction.

C. *Mistrial Based on Commonwealth Reference to "Jail[ Call]s"*

Lastly, Jones asserts that the trial court erred in denying his motion for a mistrial after the Commonwealth referenced the jail calls played at trial in its closing argument. We find no error in the trial court's ruling on the motion.

"In a criminal case, when defense counsel makes a motion for a mistrial based on an allegedly prejudicial remark or question by the prosecutor, the circuit court must make a factual determination whether a defendant's right to a fair trial has been prejudiced, thereby requiring a new trial." *Lewis v. Commonwealth*, 269 Va. 209, 214 (2005). "This determination must be made in light of all the circumstances in the case, including whether the jury was given a cautionary instruction regarding any improper remark or question." *Id.* "Unless we can say that the trial court's determination was wrong as a matter of law, we will not disturb its judgment on appeal." *Blanton v. Commonwealth*, 280 Va. 447, 455 (2010) (quoting *Green v. Commonwealth*, 266 Va. 81, 102 (2003)).

In this case, Jones objected to the prosecutor's comment and argued that it "unduly influence[d]" the jury and was "unduly prejudicial" to his case. However, the trial court found that the record contained sufficient evidence from which the jury could infer on its own that Jones made the phone calls from jail. Both phone calls were admitted at trial and played for the jury without objection. During the phone calls, Jones and Pettis both referenced the fact that Jones was in jail. Jones discussed being released and "com[ing] back out there" "on the streets." At one point, Pettis said to Jones, "you're on a fucking jail call." Jones also told Pettis he was not "trying to jail talk" with a man because he had women to do that with. Jones talked about being "in here" and, trying to convince Pettis not to testify, said that if he did not appear in court "they gotta let [him] up out of

- 10 -

this bitch." Considering the innocuous nature of the prosecutor's comment in light of all of the facts and circumstances of this case, and that the calls themselves—even without the prosecutor's comment—indicated that they were made when Jones was in jail, the reference to "jail[ call]s" in closing in no way interfered with Jones's right to a fair trial. Accordingly, the trial court did not abuse its discretion in refusing to grant Jones's motion for a mistrial, and we will not disturb its judgment.

### III. CONCLUSION

For the foregoing reasons, we conclude that the evidence was sufficient to support the conviction for unlawful wounding. Further, the trial court did not abuse its discretion in granting the Commonwealth's jury instruction on interpreting inconsistent statements or in denying Jones's motion for a mistrial. We therefore affirm the trial court's judgment.

*Affirmed.*