COURT OF APPEALS OF VIRGINIA

Present:  Judges O'Brien, Ortiz and Friedman
Argued at Fredericksburg, Virginia


DREW JOHN STEINER

v.      Record No. 0923-24-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE FRANK K. FRIEDMAN
SEPTEMBER 30, 2025


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Richard E. Gardiner, Judge

(Brandon R. Sloane; Sloane Stewart, PLLC, on brief), for appellant.
Appellant submitting on brief.

Justin B. Hill, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, Drew Steiner was convicted of unlawful videotaping and rape.[1]

Steiner asserts that the trial court erred by (1) not granting a mistrial, (2) allowing the

Commonwealth to cross-examine him on certain matters, (3) granting two jury instructions on

consent that Steiner claims were unsupported by the evidence, and (4) finding the evidence

sufficient to support his conviction for rape.  We affirm.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Steiner was also convicted of abduction with intent to defile, but the trial court granted
Steiner's motion to set aside that conviction and dismissed the indictment for that offense.

BACKGROUND[2]

This is a case that involved a sexual encounter where the primary dispute at trial was whether it was consensual. In 2020, S.W.[3] used a dating website to find "sugar baby type arrangements," that are "mutually beneficial," and involve gifts or money. She called herself "Crystal." Steiner, who used the same website, went by the name "Corey." He messaged her, and the two began communicating. Text messages between the two were admitted at trial. Although they began texting in May 2020, they did not actually meet in person until August 18, 2020. In a text message that day, Steiner offered a $750 "allowance" and gave her his address. She took a Lyft to Steiner's house.

When she arrived, S.W. sat with Steiner in the kitchen and discussed matters such as music and work. A laptop situated on a barstool played "something to do with politics," but there was "no audio coming out of it," which S.W. thought was "weird." When Steiner gave S.W. his phone to find music to play, she noticed that he was "recording," but she didn't think anything of it since it was their first time meeting and "[i]f he wanted to record" their conversations "to protect himself" that was "fine." But she did not consent to any recordings of their sexual encounter. When Steiner turned off all the lights, the only light she saw was the one emanating from the laptop, which she also thought was weird, so she asked Steiner to move to the couch. Instead, Steiner said, "Let's go upstairs."

S.W. followed Steiner upstairs in the dark and entered a bedroom, where she could barely make out the shape of the furniture. She asked him to get a condom, and they engaged in consensual sexual activity, including sexual intercourse. During the sexual encounter, however,

---

[2] On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

[3] We refer to the victim by her initials to protect her privacy.

Steiner removed the condom. S.W. told Steiner that she did not want to have sex without a condom. Despite this, he threw the condom across the room and continued without her consent. She told Steiner something to the effect of "I'm not giving you consent to do this" or "I'm not giving you consent to have sex without a condom," and covered her vagina with her right hand. She tried to close her legs as much as she could and explained her concern about HIV and sexually transmitted diseases (STDs). She even told him that she already had HIV because she "didn't want him to have sex without a condom." S.W. tried to get up and said she wanted to go home. She said that her roommate knew where she was and would call the police if she wasn't home by midnight, but Steiner firmly grabbed her left arm and pinned her against the bed with his body. He told her no one would be looking for her and asked if she knew how many bodies are in the Potomac River. When she asked if he was threatening to kill her, Steiner responded, "It's not a threat. I'm going to do it." At that point, she submitted to sexual intercourse because she thought he might kill her if she didn't.

S.W. pleaded with Steiner to let her go home. She asked to use the bathroom, at which point Steiner "disappeared" with her phone and refused to return it. When he returned, he continued to have sexual intercourse with her without a condom; S.W. reiterated that she submitted to Steiner only because she feared for her safety. Afterwards, Steiner agreed to take her home and allowed her to follow him downstairs and out of the house. S.W. gave Steiner the address for a Trader Joe's near her house and he took her there. Steiner said he would love to see her again, but that it was up to her because he had "just traumatized [her]." Steiner returned her phone when they arrived. When she returned home, she and her roommate called a rape crisis hotline. She then went to the hospital for medical treatment and submitted to a "rape kit."

Unbeknownst to S.W., Steiner videotaped their encounter. The video clips were admitted at trial. One clip captured S.W. repeatedly saying, "please no," and "I don't want to." A

different clip showed Steiner telling S.W. he would return her phone to her "as soon as we get to where we need to be" and S.W. asking if she could follow Steiner down the stairs. In another clip, Steiner asked S.W. "what is your big deal about not having sex with a condom?" The remaining clips captured the two having sex. The Commonwealth also admitted a video titled "Crystal nacht role play," which was a compilation of the videos played for the jury. S.W. testified that she did not give Steiner permission to videotape their encounter.

The following day, S.W. sent a text message to Steiner that said, "You said you would give me my money last night." Steiner responded, "Okay[,] Ur right. Wanna collect it this weekend?" S.W. did not agree to meet again and instead, indicated that she took money by Cash App, Venmo, and PayPal. Steiner responded that he would use Venmo. Steiner sent a text message that said, "How much do I owe u? Can we meet this weekend?" S.W. responded that he owed her $750, and Steiner texted back "Saturday night 8pm." S.W. told Steiner she would not meet up with him again until he paid her for the last encounter. They exchanged additional text messages where Steiner accused S.W. of making false claims, while S.W. told Steiner that he had threatened to kill her and then raped her. S.W. went to the police department on August 22, 2020, and reported the matter.

At trial, Netania Chengiah, S.W.'s roommate, testified that she sent a text message to S.W. on the night of the incident asking if she was okay. S.W. responded, "Yes. I'm good. I'll tell you everything when I see you." Chengiah got nervous, however, when she sent a second text message later in the evening and S.W. did not respond. Chengiah testified that S.W. arrived home around 12:15 a.m. and was sobbing hysterically, "shaking," and kept saying "I was so scared." S.W. told Chengiah that Steiner raped her and threatened to kill her and dump her body in the Potomac River.

Chengiah and S.W. used Steiner's phone number to conduct a "reverse phone check" to figure out the identity of "Corey." They found pictures of his house and confirmed his address. Chengiah testified, "yeah, we saw the criminal record," and confirmed that Steiner was the person S.W. knew as "Corey."

After direct and prior to cross-examination, Steiner's counsel moved for a mistrial based on Chengiah's testimony related to Steiner's criminal record. After hearing the Commonwealth's response, the trial court denied the motion for a mistrial but gave a curative instruction. The trial court stated that it would instruct the jury that it must disregard the comment about the criminal record and would have it stricken from the record. Steiner's counsel responded, "I think that's appropriate." The trial court then instructed the jury as follows:

> Ladies and gentlemen, you heard a very brief reference by the witness to having seen, when she went on White Pages, a criminal record. You're to ignore that statement and it's stricken from the record.

No subsequent objection was made by Steiner alerting the trial court that the curative instruction was insufficient to remedy the issue.

Forensic Nurse Examiner Cheryl Bogdan performed a sexual assault examination (PERK) on S.W. Bodgan testified that S.W. reported to her that she had been involved in "a consensual encounter that became non-consensual when the assailant refused the condom and refused to stop." During the exam, Bogdan observed a "milky, white fluid in the vaginal vault." She also collected DNA swabs from S.W.'s lips, mouth, neck, breast, thighs, external genitalia, perineum, cervix, and anus.

Fairfax County Police Detective Caitlin O'Malley collected S.W.'s PERK kit from Washington MedStar Hospital and then collected a buccal swab from S.W.'s boyfriend. Detective O'Malley also collected a buccal swab from Steiner. She later transported those items to the Department of Forensic Science for analysis.

Forensic Scientist Shiao-mei Smith testified as an expert in the field of forensic biology and the "identification and analysis of DNA." Smith collected both a sperm and a non-sperm male sample, or "fraction," from S.W.'s vaginal-cervical swab. From the sperm fraction, Smith developed a DNA mixture profile attributable to S.W.'s boyfriend "and one additional male contributor." She could not eliminate Steiner as the additional male contributor to that mixture. Smith also developed a DNA profile from the non-sperm fraction associated with S.W.'s vaginal-cervical sample and could not eliminate Steiner as a contributor to that sample; S.W.'s boyfriend was eliminated as a contributor to that fraction.

Clara Ines Davila Guerrero was Steiner's wife at the time. In 2020, she traveled to Colombia on more than one occasion for medical treatment. While she was in Colombia, Steiner told her that he purchased a webcam. Guerrero testified that Steiner also owned a red laptop computer that he kept in the kitchen. When she returned from Colombia in August 2020, the red laptop was on the counter as usual. She traveled to Colombia again in September 2020, but when she returned, the laptop was no longer there.

The Commonwealth and Steiner stipulated that Michelle and Lynn Steiner are the defendant's sisters and that on October 20, 2020, Michelle had access to Steiner's red laptop. Further, the parties stipulated that Michelle and Steiner had a phone conversation on that date where the following was said:

> [Steiner]: You know one thing I was going to ask you. Is that red computer on the table there? Is there a red computer there?
>
> [Michelle]: Yes.
>
> [Steiner]: Okay. Yeah, that's got a bunch of crap in it. I would really like the computer destroyed. If Clara, you know, that's where Clara got a lot of crap off of. But if there's any way to destroy that computer that would be ideal.
>
> [Michelle]: What do you mean crap?

- 6 -

[Steiner]: Well, just trust me. That computer's got crap on it. It needs to be, it needs to be destroyed.

[Michelle]: Um --

[Steiner]: We'll talk about something else.

The parties further stipulated that between October 21, 2020, and November 14, 2020, Michelle transported Steiner's red laptop from Virginia to Minnesota where she and Lynn resided and that on November 14, 2020, Michelle brought the red laptop to Lynn's home. In conjunction with Virginia authorities, law enforcement officers in Minnesota executed a search warrant at Lynn's home in Minnesota and recovered the red laptop.

Detective O'Malley received Steiner's red laptop from Minnesota and later sent it to the Police Department's Digital Forensics Section for analysis. She later learned that Steiner titled the video he made with S.W. as "Crystal nacht role play." At trial, the Commonwealth asked Detective O'Malley if she knew what "Kristallnacht" meant, and she responded that "Kristallnacht" is a German term that is translated "night of crystal" and is commonly known as "the Night of Broken Glass." When the Commonwealth asked what the "Night of Broken Glass" referred to, Steiner objected on relevance grounds, and the Commonwealth responded, "Kristallnacht" is a reference to "the Night of Broken Glass" which is "an incredibly violent night" in Nazi Germany and "belies the claims that this is simply role play." The trial court sustained the objection, noting that the Commonwealth's contention was "a stretch" and "all he did was put '[C]rystal Night,' which means the night he spent with [C]rystal."

Detective Brian Bayliss testified as an expert in computer and cell phone forensics. He acknowledged that one of the videos extracted from Steiner's laptop was titled "Crystal nacht role play," but he denied creating or altering the title in any way. This video was created, last accessed, and last modified on Steiner's computer at 10:55 a.m. on August 20, 2020, and it was saved to a folder on Steiner's laptop at 11:05 a.m. Detective Bayliss confirmed that "Crystal

- 7 -

nacht role play" was a "user-created file name," as opposed to having been generated by the computer itself.

Steiner moved to strike the evidence. With respect to the unlawful videotaping charge, Steiner argued that S.W. testified that she suspected she was being recorded, and thus the evidence failed to prove Steiner videotaped her without her knowledge and consent. As for the rape charge, Steiner argued that the evidence failed to prove he penetrated her after she withdrew her consent, and in any case that she appeared on the video to be consenting to any sexual activity that occurred. After hearing the Commonwealth's response, the trial court denied the motion to strike.

Steiner testified and his basic defense was that the entire encounter was consensual; to the extent it looked otherwise, he argued that was part of the roleplaying. Steiner stated that before meeting S.W., they had discussions about "domination," "submission," and "rough sex." Steiner said that they also discussed STDs. According to Steiner, when S.W. arrived at his residence, they discussed what they both expected that night, and he told her that he was interested in "rough sex." He told her that he recently tested negative for STDs, and, according to him, they agreed to "go forward with sex without a condom." He testified that the two designated "red light" as the "safe word."

Steiner acknowledged that he used a condom at the start of the sexual encounter, but that it eventually fell off, at which point S.W. stated to continue without it. Steiner also agreed that there was a part in the video where S.W. said "no, no, no." He explained, however, that in their discussions he had asked her "to portray a person who is in distress, who would be screaming for mercy, begging me to stop." He said that was part of the routine in his previous encounters as well, and he agreed that he made threats to S.W. as "part of the plan." Steiner admitted that he named one of the videos "Crystal nacht" but said it just meant "Crystal night." Steiner denied

ejaculating during the encounter and also denied taking her phone. Steiner testified that he did not have sex with S.W. against her will, that he did not threaten her or force her to do any of the acts seen in the video, and that she consented to the videotaping. Steiner testified that he did not pay S.W. the money they agreed upon because he did not have an orgasm. He added that he asked his sister to destroy the laptop because it contained videos of his other encounters, and he had promised his various partners that no one else would see them.

On cross-examination, Steiner conceded that the text messages between himself and S.W. made no reference to rough sex, safe words, role play, unprotected sex, or videotaping the encounter. Rather, Steiner's texts indicated he was interested in warm connections, soft touches, and "just passion and mutual benefit." He also admitted that he threatened to kill S.W., put her in the Potomac River, and told her that no one would ever look for her. He explained that he said those things because he was role playing and pretending to be dominant. Steiner acknowledged that he titled one of the videos "Crystal nacht role play." When the Commonwealth asked if Steiner was aware that "Crystal[ N]acht" sounds like the German reference to "Kristallnacht," Steiner replied "Sure. It's probably the same." The Commonwealth then asked if Steiner was familiar with the historical event of Kristallnacht, and Steiner's counsel objected. The trial court overruled the objection, explaining that unlike the day before, this was "cross examination" and Steiner could answer "no," and the Commonwealth would be "stuck with his answer." The following exchange occurred:

> Q: So, you're familiar with the historical event Kristallnacht, right?
>
> A: Oh, yes.
>
> Q: Right. That refers to November 9th and 10th of 1938, right?
>
> A: Yes.
>
> Q: All right. Pre-World War II Germany?

A: Correct.

Q: Where Nazi leaders destroyed Jewish-owned businesses, places of worship and homes?

A: Yeah, horrific.

Q: Right? And so you named your sex movie something that sounds the exact same when you say it out loud as a Nazi war crime?

. . . .

A: Yes.

On redirect, Steiner stated that he came up with the video title based on S.W.'s OnlyFans account, which was called "Crystal Night."

Steiner rested and renewed his motion to strike. He argued that the evidence failed to prove S.W. withdrew her consent to sexual intercourse and asserted that S.W. made inconsistent statements. He merely "submit[ted] on the evidence" regarding the unlawful videotaping offense. The trial court denied the motion to strike.

During the jury instruction phase, Steiner objected to two instructions proposed by the Commonwealth related to the issue of consent. Jury Instruction 20 provided: "Consent to engage in sexual acts must be ongoing and capable of being withdrawn at any time. Consensual sexual activity requires 'continued consent' during the duration of the activity." Steiner objected on the basis that the instruction was "common knowledge" and that it was not a model jury instruction. The Commonwealth contended that the instruction was an accurate statement of law, citing *Conley v. Commonwealth*, 74 Va. App. 658 (2022). The Commonwealth argued that the instruction was appropriate because the case was about consent and whether S.W. withdrew her consent when Steiner removed his condom. The trial court opined that the instruction was a correct statement of law and that this was not a matter of common knowledge. The trial court noted that S.W.'s consent was "a pretty significant issue" in the case and granted the instruction.

Steiner also objected to Instruction 23. That instruction read: "Submission through fear to sexual intercourse is not consent. A consent induced by fear of bodily harm or personal violence is no consent." This instruction was not a model jury instruction either; it was based off language in *Sutton v. Commonwealth*, 228 Va. 654 (1985). The Commonwealth argued that this instruction was important since the whole case revolved around consent. The Commonwealth also noted that S.W. testified that she "ultimately gave up[ and] became compliant because she was in fear that she was going to be killed and placed in the Potomac River."

Steiner argued that Instruction 23 was likely to confuse the jury when considered alongside Instruction 12, which noted that the "element of force, threat, or intimidation required must have been sufficient to overcome any unwillingness on the part of [S.W.] to have sexual intercourse." He also asserted that Instruction 23 "is a bit contradictory and cumulative to where it just confuses the matter more than it helps." Steiner did not argue that the instruction was a misstatement of the law. The trial court found that the instruction was "appropriate, given the facts" and granted it.

The jury ultimately convicted Steiner of rape and unlawful videotaping. Steiner appeals.

ANALYSIS

I. Motion for Mistrial

A "ruling denying a motion for mistrial will be set aside on appellate review only if the ruling constituted an abuse of discretion." *Gross v. Stuart*, 297 Va. 769, 774 (2019) (quoting *Allied Concrete Co. v. Lester*, 285 Va. 295, 308 (2013)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Commonwealth v. Swann*, 290 Va. 194, 197 (2015) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)). "However, '[a circuit] court by definition abuses its discretion when it makes an error of law . . . . The abuse-of-discretion standard includes review to determine that the discretion was not guided by

erroneous legal conclusions.'" *Murray v. Commonwealth*, 71 Va. App. 449, 456 (2020) (alterations in original) (quoting *Porter v. Commonwealth*, 276 Va. 203, 260 (2008)). "To properly review the trial court's application of the law to the facts, '[w]e give deference to the trial court's factual findings and view the facts in the light most favorable to . . . the prevailing part[y] below.'" *Stone v. Commonwealth*, 297 Va. 100, 102 (2019) (alterations in original) (quoting *Kim v. Commonwealth*, 293 Va. 304, 311 (2017)).

"When a motion for mistrial is made, based upon an allegedly prejudicial event, the trial court must make an initial factual determination" as to whether "the defendant's rights are so 'indelibly prejudiced' as to necessitate a new trial." *Green v. Commonwealth*, 266 Va. 81, 102 (2003) (quoting *Spencer v. Commonwealth*, 240 Va. 78, 95 (1990)). Whether the conduct was so prejudicial as to require a new trial, "is basically a question of fact to be determined in light of all the circumstances in each particular case." *Landeck v. Commonwealth*, 59 Va. App. 744, 755 (2012) (quoting *Saunders v. Commonwealth*, 218 Va. 294, 303 (1977)). "Thus, a trial court's denial of a motion for a mistrial will not be reversed on appeal unless there exists a manifest probability as a matter of law that the improper evidence prejudiced the accused." *Mills v. Commonwealth*, 24 Va. App. 415, 420 (1997).

Manifest probability of prejudice exists "when the evidence is 'so impressive that it probably remained on the minds of the jury and influenced their verdict.'" *Terry v. Commonwealth*, 5 Va. App. 167, 169 (1987) (quoting *Coffey v. Commonwealth*, 188 Va. 629, 636 (1949)). "Unless we can say that the trial court's determination was wrong as a matter of law, we will not disturb its judgment on appeal." *Spence v. Commonwealth*, 60 Va. App. 355, 364 (2012) (quoting *Blanton v. Commonwealth*, 280 Va. 447, 455 (2010)).

Here, in response to a narrowly stated question by the Commonwealth regarding how they identified Steiner, Chengiah testified that she and S.W. identified him using his phone

number.  Without any additional prompting by the Commonwealth, Chengiah then stated, "[a]nd then -- yeah, we saw the criminal record."  According to Steiner, Chengiah's answer suggested to the jury that Steiner had a criminal record.  However, as noted by the Commonwealth, Chengiah's statement was not responsive to the Commonwealth's specific query as to what "tools" she and S.W. used to discover Steiner's true identity.  Moreover, as the trial court noted, Chengiah did not actually testify that Steiner had a criminal record or, if so, what was on it.[4]  We do not therefore conclude that Chengiah's statement was "so impressive that it probably . . . influenced [the] verdict."  *Terry*, 5 Va. App. at 169 (quoting *Coffey*, 188 Va. at 636).

In any event, the trial court granted a curative instruction telling the jury to disregard Chengiah's answer, and then Steiner's counsel agreed with that remedy, telling the trial court, "I think that's appropriate."  "Generally, a trial court may cure errors arising from improperly presented evidence by immediately instructing the jury to disregard that evidence."  *Terry*, 5 Va. App. at 168-69.  Thus, in reviewing a trial court's ruling on a mistrial motion, this Court will consider "whether the jury was given a cautionary instruction regarding any improper remark or question."  *Lewis v. Commonwealth*, 269 Va. 209, 214 (2005).  "It is always to be presumed that the jury followed an explicit cautionary instruction promptly given, unless the record clearly shows that the jury disregarded it."  *Spencer*, 240 Va. at 95.  There is no evidence in the record indicating that the jury disregarded the trial court's instruction to ignore Chengiah's reference to a criminal record.

Thus, based on the minimalistic nature of Chengiah's statement and the curative instruction given by the trial court, we cannot conclude that the trial court's failure to grant a

---

[4] Rather, she referenced a criminal record that may, or may not, have included prior convictions, that may, or may not, have been listed with specificity, and that may, or may not, have been correct.  Thus, Chengiah's answer to the Commonwealth's question did not confirm that Steiner had committed other offenses, nor did it explicitly link Steiner to any prior criminal acts, including rape.

- 13 -

mistrial created a "manifest probability as a matter of law" that Chengiah's answer "prejudiced the accused." *Mills*, 24 Va. App. at 420.[5] We therefore affirm the trial court's ruling on Steiner's motion for a mistrial.

## II. Crystal Nacht Role Play

"Generally, the admissibility of evidence is within the discretion of the trial court and we will not reject the decision of the trial court unless we find an abuse of discretion." *Midkiff v. Commonwealth*, 280 Va. 216, 219 (2010). "The abuse of discretion standard draws a line—or rather, demarcates a region—between the unsupportable and the merely mistaken, between the legal error . . . that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not." *Jefferson v. Commonwealth*, 298 Va. 1, 10-11 (2019) (alteration in original) (quoting *Reyes v. Commonwealth*, 297 Va. 133, 139 (2019)). "In evaluating whether a trial court abused its discretion, . . . 'we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action.'" *Carter v. Commonwealth*, 293 Va. 537, 543 (2017) (alteration in original) (quoting *Grattan*, 278 Va. at 620). "[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the [reviewing] court does not reverse merely because it would have come to a different result in the first instance." *Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (alterations in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)).

"[W]hen 'determining whether relevant evidence should be admitted, the trial court must apply a balancing test to assess the probative value of the evidence and any undue prejudicial

---

[5] We do not address Steiner's contention that the trial court's curative instruction was "insufficient" to overcome the prejudice Chengiah's testimony caused him. He did not make that objection in the trial court and instead, agreed that it was "appropriate" to give a curative instruction under the facts of this case. *See* Rule 5A:18.

effect of that evidence.'"  *Commonwealth v. Proffitt*, 292 Va. 626, 639 (2016) (quoting *McCloud v. Commonwealth*, 269 Va. 242, 257 (2005)); *see* Va. R. Evid. 2:403.  "Under this balancing test, relevant evidence will only be excluded when its probative value is 'substantially outweighed' by its unfair prejudice."  *Proffitt*, 292 Va. at 639 (quoting Va. R. Evid. 2:403).  "'[U]nfair prejudice' refers to the tendency of some proof to inflame the passions of the trier of fact, or to invite decision based upon a factor unrelated to the elements of the claims and defenses in the pending case."  *Id.* at 636 (alteration in original) (quoting *Lee v. Spoden*, 290 Va. 235, 251 (2015)).  To that end, the "determination of the scope of cross-examination in general," and the "extent of testimonial impeachment in particular," is "'left largely to the sound discretion of the trial court.'"  *Spruill v. Commonwealth*, 221 Va. 475, 485 (1980) (quoting *Worrell v. Kinnear Co.*, 103 Va. 719, 724 (1905)).  "[A]n appellate court will not interfere, unless that discretion has been plainly abused."  *Id.* (quoting *Worrell*, 103 Va. at 724).

Steiner asserts that the trial court abused its discretion by allowing the Commonwealth to cross-examine him about the title he gave his videotape.  Steiner's assignment of error provides: "The trial court erred in permitting the defendant to be cross-examined so as to imply that the name the defendant gave to a video recording was intentionally done to equate the act to a Nazi war crime as to do so was more prejudicial than probative."  On brief, he argues that the "cross-examination on this issue" had no probative value to any of the issues in the case and therefore "served only to inflame and prejudice the jury with respect to the actual determinations that were needed."

Assuming without deciding that the trial court erred by allowing the Commonwealth to question Steiner regarding the name he gave his "Crystal Nacht Role Play" video, we find any error harmless.[6]

Because Steiner alleges that the trial court erred in an evidentiary ruling and he does not raise any constitutional issue, we apply the non-constitutional harmless error standard. *See Shaw v. Commonwealth*, ___ Va. ___, ___ (April 17, 2025) ("The error alleged by [appellant], that the trial court erred in an evidentiary ruling, does not implicate a Constitutional issue, and therefore, we review the matter under the non-constitutional harmless error standard."). Non-constitutional error is harmless "[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached." *Salahuddin v. Commonwealth*, 67 Va. App. 190, 212 (2017) (alteration in original) (quoting Code § 8.01-678). "In making the relevant determinations, the court 'consider[s] the potential effect of the excluded evidence in light of all the evidence that was presented to the jury.'" *Commonwealth v. Kilpatrick*, 301 Va. 214, 217 (2022) (alteration in original) (quoting *Haas v. Commonwealth*, 299 Va. 465, 467 (2021)). "To reach this conclusion, the evidence of guilt must be so overwhelming that it renders the error insignificant by comparison such that the error could not have affected the verdict." *Id.*

---

[6] We also assume without deciding that Steiner preserved this issue for appellate review. "[T]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" *Commonwealth v. White*, 293 Va. 411, 419 (2017) (quoting *Swann*, 290 Va. at 196). "The mechanism of assuming without deciding a particular point in issue sometimes facilitates the appellate court's achievement of this goal." *Ali v. Commonwealth*, 75 Va. App. 16, 37 n.9 (2022).

Steiner notes that he made a contemporaneous objection in response to the prosecutor's question about Steiner's familiarity with the historical event, Kristallnacht. In the trial court, Steiner's counsel objected on the grounds that such questioning was inappropriate and would suggest "something that's very sinister." Steiner's counsel also argued that the trial court did not permit such testimony the prior day with a different witness. The Commonwealth argues this issue is waived because Steiner never raised the issue of prejudice in his contemporaneous objection.

- 16 -

Here, the evidence against Steiner was overwhelming. S.W. testified extensively about her interactions with Steiner, the text messages they shared, the amount of money they agreed upon, and the consensual nature (at first) of their sexual interaction. She explained that when he removed his condom, she withdrew her consent and clearly conveyed that to Steiner multiple times. Nonetheless, Steiner pinned her to the bed and continued to have sexual intercourse without S.W.'s consent. Steiner also threatened to kill her and toss her body into the Potomac River, which frightened S.W. Moreover, her testimony was corroborated to a large degree by DNA evidence, Chengiah's testimony, the video evidence, the text messages, and even Steiner's testimony. Steiner's counsel also questioned him about the video title on direct examination, leaving the door open for the Commonwealth to question him further on that subject during cross-examination.

In short, even if the testimony was erroneously admitted, any error was harmless, where the record contains overwhelming evidence upon which the jury could find that Steiner was guilty of rape. Accordingly, we find that Steiner "had a fair trial on the merits" and that "substantial justice has been reached." *Salahuddin*, 67 Va. App. at 212.

### III. Jury Instructions

"As a general rule, the matter of granting and denying instructions . . . rest[s] in the sound discretion of the trial court." *Dandridge v. Commonwealth*, 72 Va. App. 669, 679 (2021) (alterations in original) (quoting *Lienau v. Commonwealth*, 69 Va. App. 254, 264 (2018)). "The trial court's 'broad discretion in giving or denying instructions requested' is reviewed for an abuse of discretion." *Id.* (quoting *King v. Commonwealth*, 64 Va. App. 580, 586 (2015) (en banc)). However, we review de novo whether a proffered instruction states the law with accuracy. *Sarafin v. Commonwealth*, 288 Va. 320, 325 (2014). Thus, "[o]ur sole responsibility in reviewing [jury instructions] is to see that the law has been clearly stated and that the

instructions cover all issues which the evidence fairly raises." *Pena Pinedo v. Commonwealth*, 300 Va. 116, 121 (2021) (second alteration in original) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)).

To that end, a proffered jury instruction "must be supported by 'more than a scintilla' of evidence." *Graves v. Commonwealth*, 65 Va. App. 702, 708 (2016) (quoting *Turman v. Commonwealth*, 276 Va. 558, 564 (2008)). "'The weight of the credible evidence that will amount to more than a mere scintilla . . . is a matter to be resolved on a case-by-case basis' by assessing the evidence in support of a proposition against the 'other credible evidence that negates' it." *Lienau*, 69 Va. App. at 264 (alteration in original) (quoting *King*, 64 Va. App. at 587). "Additionally, '[w]here the conflicting evidence tends to sustain either the prosecution's or defense's theory of the case, the trial judge *must* instruct the jury as to both theories.'" *King*, 64 Va. App. at 587 (alteration in original) (quoting *Foster v. Commonwealth*, 13 Va. App. 380, 383 (1991)). "Upon review, the evidence must be viewed in the light most favorable to the proponent of the instruction." *Mayberry v. Commonwealth*, 66 Va. App. 93, 101 (2016).

"If any person has sexual intercourse with a complaining witness, whether or not his or her spouse . . . and such act is accomplished (i) against the complaining witness's will, by force, threat or intimidation . . . he or she shall be guilty of rape." Code § 18.2-61. "[T]he crime of rape is, at core, an offense against the will and consent of the victim, irrespective of the manner and means by which the rape is accomplished." *Molina v. Commonwealth*, 47 Va. App. 338, 357 (2006). It follows that consent is an absolute bar to a conviction for rape when the alleged victim is over the age of consent.[7] *Mery v. Commonwealth*, 12 Va. App. 821, 825 (1991).

---

[7] Indeed, the trial court granted Steiner an instruction that read, "Consent by [S.W.] is an absolute bar to conviction of rape. If, after consideration of all the evidence, you have a reasonable doubt as to whether [S.W.] consented to have intercourse with the Defendant, then you shall find the Defendant not guilty."

- 18 -

On appeal, Steiner's assignment of error on this issue asserts that the two consent instructions, which he challenges, "did not cover an issue which the evidence fairly raised." Steiner concedes that the challenged instructions accurately stated the law. The issues covered by the instructions were important to the Commonwealth, since the entire case (from both perspectives) rested on whether S.W. consented to all acts of sexual intercourse, or if she only submitted to further sexual acts because she felt threatened and intimidated. Steiner insisted that S.W. never withdrew her consent and that any evidence to the contrary merely resulted from "fantasy," role play. S.W. adamantly denied that claim and instead asserted that she withdrew her consent after Steiner removed his condom and only submitted to further sexual intercourse because he threatened to kill her. Again, the record contains sufficient evidence corroborating S.W.'s testimony. Thus, viewing the instructions in the light most favorable to the Commonwealth, as the proponent of the instructions, we find no error in the trial court's decision to grant them. Both instructions were supported by more than a scintilla of evidence; they were a correct statement of the law and "cover[ed] an issue which the evidence fairly raised." Thus, the trial court did not abuse its discretion in granting the challenged instructions.

## IV. Sufficiency of the Evidence

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v.*

*Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Determining the credibility of the witnesses and the weight afforded their testimony "is within the exclusive province of the jury, which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). "Where credibility issues are resolved by the jury in favor of the Commonwealth, those findings will not be disturbed on appeal unless plainly wrong." *Smith v. Commonwealth*, 56 Va. App. 711, 718 (2010). This Court must accept a trial court's judgment on the credibility of a witness's testimony "unless, 'as a matter of law, the testimony is inherently incredible.'" *Lambert v. Commonwealth*, 70 Va. App. 740, 759 (2019) (quoting *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006)). "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006) (quoting *Cardwell v. Commonwealth*, 209 Va. 412, 414 (1968)). "In other words, this Court cannot say a witness'[s] testimony is inherently incredible unless it is 'so contrary to human experience as to render it unworthy of belief.'" *Lambert*, 70 Va. App. at 759 (quoting *Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011)).

A. Waiver of any assertion that S.W.'s testimony was inherently incredible

At trial, Steiner did not assert that S.W.'s testimony was inherently incredible. He makes that argument for the first time on appeal. As we have already stated, this Court is precluded

from considering "as a basis for reversal" any objections that were not stated "with reasonable certainty at the time of the ruling." Rule 5A:18. "Under settled principles, the 'same argument must have been raised, with *specificity*, at trial before it can be considered on appeal.'" *Johnson v. Commonwealth*, 58 Va. App. 625, 637 (2011) (emphasis added) (quoting *Correll v. Commonwealth*, 42 Va. App. 311, 324 (2004)). "Making one specific argument on an issue does not preserve a separate legal point on the same issue for review." *Edwards v. Commonwealth*, 41 Va. App. 752, 760 (2003) (en banc).

"A legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness'[s] testimony or statements. Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019). "Consequently, as Virginia law dictates, '[p]otential inconsistencies in testimony are resolved by the fact finder,' not the appellate court." *Id.* (alteration in original) (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011)). "'[T]here can be no relief' in this Court if a witness testifies to facts 'which, if true, are sufficient' to support the conviction '[i]f the trier of the facts' bases its decision 'upon that testimony.'" *Id.* at 626 (alterations in original) (quoting *Smith*, 56 Va. App. at 718-19). Steiner did not assert at trial that S.W.'s testimony was inherently incredible. Instead, he argued that the video failed to show she withdrew her consent to sexual intercourse and that S.W. made inconsistent statements. We will therefore not consider Steiner's specific assertion on appeal that S.W.'s testimony was inherently incredible as a matter of law.

### B. Force, threat, or intimidation

Steiner did argue in the trial court that the evidence failed to prove he overbore S.W.'s will through the use of force, threat, or intimidation. Upon our review of the record, we disagree.

As noted above, any person having sexual intercourse "with a complaining witness . . . against the complaining witness's will, by force, threat or intimidation . . . shall be guilty of rape." Code § 18.2-61(A). "The Code itself does not define force in the context of sexual offenses." *Nelson v. Commonwealth*, 73 Va. App. 617, 624 (2021). But "force" can be actual or constructive. *Id.* Actual force requires proof of more than just "the force required to accomplish" the criminal act. *Bondi v. Commonwealth*, 70 Va. App. 79, 88 (2019) (quoting *Sabol v. Commonwealth*, 37 Va. App. 9, 16 (2001)). "[T]he [actual] force used by the defendant must be sufficient to accomplish the act as well as to overcome the will of the victim." *Id.* (quoting *Wactor v. Commonwealth*, 38 Va. App. 375, 381 (2002)). "The degree of resistance by the victim and, consequently, the degree of force required to overcome her will, 'necessarily depend[] on the circumstances of each case, taking into consideration the relative physical condition of the participants and the degree of force manifested.'" *Id.* (alteration in original) (quoting *Wactor*, 38 Va. App. at 382). Constructive force, by contrast, "is shown by the act of non-consensual intercourse itself." *Gonzales v. Commonwealth*, 45 Va. App. 375, 383 (2005) (en banc).

"Intimidation requires 'putting a victim in fear of bodily harm by exercising such domination and control of her as to overcome her mind and overbear her will.'" *Sabol*, 37 Va. App. at 18 (quoting *Sutton*, 228 Va. at 663). "Intimidation may occur without threats." *Sutton*, 228 Va. at 663. In such cases, the fear of bodily harm "must derive from some conduct or statement of the accused." *Sabol*, 37 Va. App. at 18. On the other hand, a *threat* is an "expression of an intention to do bodily harm." *Id.* at 17 (quoting *Morse v. Commonwealth*, 17 Va. App. 627, 634 (1994)). That is, a threat is "an overt expression, by words or conduct, of a present intention to commit an immediate act of violence or force against the victim." *Id.* at 18 (quoting *Bivins v. Commonwealth*, 19 Va. App. 750, 752 (1995)). "The issue of whether the

- 22 -

crime was committed by 'force, threat or intimidation' is a question of fact." *Bondi*, 70 Va. App. at 88.

As the Commonwealth observes, the evidence in this case was sufficient for the jury to conclude beyond a reasonable doubt that Steiner raped S.W. through the use of force, threats, *and* intimidation. S.W. testified that she initially agreed to sexual intercourse with Steiner in exchange for an "allowance" of money and, after a series of communications by text, met at his house and later followed him up the stairs to his bedroom in the dark. Although S.W. thought Steiner might be recording their voices, she was not aware he was videotaping their sexual encounter. S.W. agreed that she uninhibitedly engaged in fellatio and various sexual positions at first, but she explained that she withdrew her consent when Steiner removed his condom. S.W. testified that she covered her vagina with her right hand, closed her legs as much as she could, and loudly protested that she did not want to have sex without protection. S.W. was so concerned that she told Steiner she already had HIV and claimed that her roommate would call the police if she was not home by midnight. When she tried to get up and go home, Steiner firmly grabbed her arm and pinned her against the bed with his body. He told her no one would look for her, threatened to kill her, and asked if she knew how many bodies were in the Potomac River. S.W. testified that she only submitted to sexual intercourse after that because she thought Steiner might—as he had said—kill her if she refused. S.W. then submitted to intercourse again after a bathroom break in which Steiner "disappeared" with her phone and refused to give it back. Steiner only returned the phone after the drive home, during which he noted that he had "just traumatized [her]."

It is well established that "a conviction for rape and other sexual offenses may be sustained solely upon the uncorroborated testimony of the victim." *Poole v. Commonwealth*, 73 Va. App. 357, 368 (2021) (quoting *Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005)).

"[B]ecause sexual offenses are typically clandestine in nature, seldom involving witnesses to the offense except the perpetrator and the victim, a requirement of corroboration would result in most sex offenses going unpunished." *Id.* at 369 (quoting *Wilson*, 46 Va. App. at 88). S.W.'s testimony established the elements of rape and, by itself, proved that Steiner overbore her will through the use of force, threat, or intimidation. *See Cardenas Flores v. Commonwealth*, 84 Va. App. 495, 517 (2025) ("Thus, it is clear that the victim's testimony, if credible and accepted by the finder of fact, is sufficient evidence, standing alone, to support the conviction." (quoting *Fisher v. Commonwealth*, 228 Va. 296, 299 (1984))). Because the jury's verdict was not plainly wrong or without evidence to support it, we do not disturb it.[8]

S.W.'s testimony and the corroborating evidence established that Steiner had sexual intercourse with S.W. against her will "by force, threat or intimidation" in violation of Code § 18.2-61. We therefore conclude, as we must under our standard of review, that the evidence was sufficient to support Steiner's conviction.

CONCLUSION

For the foregoing reasons, the judgment is affirmed.

*Affirmed.*

---

[8] We note that, while not required to sustain the conviction, there was also significant evidence here corroborating S.W.'s testimony, including DNA evidence, incriminating texts, and video evidence of the sexual encounter.